HOLLYWOOD BASEBALL ASSOCIATION, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 93647.    Filed April 21, 1964.

*Arthur E. Gore*, for the petitioner.

*Douglas W. Argue* and *Lawrence S. Kartiganer*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies of $25,502.07, $20,004.38, and $8,760.08 for the taxable years ending October 31, 1955, October 31, 1956, and October 31, 1958,[1] respectively. The three remaining issues before us are as follows:

Whether gain realized from the sale of certain baseball player contracts is within the purview of section 337;

Whether an amount realized pursuant to the transfer of two major league baseball teams to the Pacific coast area is taxable as ordinary income to petitioner; and

Whether the petitioner is entitled to a claimed deduction for organizational expenses.

---

[1] Respondent, in an amended answer, asserts an additional deficiency of $102,284 for the taxable year ending Oct. 31, 1958, pursuant to sec. 6214(a), I.R.C. 1954. Unless otherwise noted, all Code references are to the I.R.C. of 1954.

Some of the facts have been stipulated and are so found.

Petitioner, Hollywood Baseball Association, was a corporation organized under the laws of the State of California on December 8, 1938. From December 8, 1938, to December 13, 1946, petitioner was known as Hollywood Baseball Investment Co. (hereinafter sometimes called Investment).

Another corporation, Hollywood Baseball Association, a California corporation (not the petitioner herein, and hereinafter sometimes called Association), was organized on December 18, 1937. This corporation was formed for the purpose of acquiring, owning, and operating a professional baseball team in the Pacific Coast Baseball League (hereinafter called P.C.L.). All of the stock of this corporation was owned, from its inception, by Mission Baseball Association, a California corporation.

As of December 1, 1938, Investment purchased all of the stock of Association from Mission Baseball Association for $40,000.

On June 13, 1946, Association filed a certificate of election to dissolve with the secretary of state of California. On December 16, 1946, it filed a certificate of dissolution with the secretary of state of California. Pursuant to the certificate of election to dissolve, all of its assets and liabilities were transferred to petitioner, its sole stockholder, on December 11, 1946. On December 13, 1946, there was filed with the secretary of state of California, a consent of the shareholders of petitioner to change petitioner's name from Hollywood Baseball Investment Co. to Hollywood Baseball Association. On and after December 13, 1946, petitioner was known as Hollywood Baseball Association.

During and prior to the fiscal years here in issue, petitioner operated under the name of the Hollywood Stars as a member club of the P.C.L.

On December 17, 1957, petitioner's stockholders adopted and assented to a plan of complete liquidation.

On its tax return for the fiscal period ended October 31, 1958, petitioner reported the following as items of nontaxable income:

SCHEDULE 1—INCOME NONTAXABLE UNDER SECTION 337 OF THE INTERNAL REVENUE CODE AND SECTION 10,352(E) OF CALIFORNIA REVENUE AND TAXATION CODE

| Item | Date of sale | Income |
|---|---|---|
| Sale of equipment (fully depr.) | Dec. 18, 1957 | $5,000 |
| Sale of field lights (fully depr.) | Feb. 28, 1958 | 5,000 |
| P.C.L. sale of franchise rights | Jan. 27, 1958 | 150,000 |
| Sale of player contracts | Mar. 28, 1958 | 117,000 |
| Sale of franchise | Dec. 18, 1957 | 100,000 |
| Total nontaxable income | | 377,000 |
| Less original cost of franchise rights | | 150,000 |
| Net nontaxable income | | 227,000 |

*Findings of Fact as to Issue 1. Regarding Whether Amounts Received For the Sale of Certain Baseball Player Contracts Are Within the Purview of Section 337*

By documents entitled "Uniform Agreement for the Assignment of a Player's Contract to or by a Major League Club" and dated October 1, 1957, petitioner assigned the contracts of two baseball players to the Pittsburgh Athletic Co., Inc. (hereinafter called Pittsburgh). The following stated conditions were contained in each of the two agreements:

*Conditionally:* For and in consideration of the sum of $70,000.00 (Seventy Thousand Dollars) of which $25,000.00 (Twenty-Five Thousand Dollars) is payable upon execution of this agreement and the balance of $45,000.00 (Forty-Five Thousand Dollars) is payable if player is retained by Pittsburgh on April 1, 1958.

Petitioner received $25,000 for each player contract and included this total sum of $50,000 in its income tax return for the fiscal period ended October 31, 1957. The cost of the two player contracts to petitioner was $4,500, which amount had been previously deducted by petitioner as an item of current expense offsetting current income for Federal income tax reporting purposes. The remaining $90,000, or $45,000 per contract, was reported by petitioner on its Federal income tax return for the period ended October 31, 1958, as nontaxable income under section 337.

By documents entitled "Official Agreement for Outright or Conditional Assignment" and dated January 3, 10, and 11, 1958, petitioner assigned the contracts of six baseball players to the Columbus Baseball Club of the International League. These have been treated as sales to Pittsburgh, which was connected with the stated buyer. The three agreements, each involving two player contracts, involved the assignment of other player contracts to petitioner and also a total of $27,000 as consideration flowing to petitioner. The cost of the six player contracts to petitioner was $17,650, which amount had been previously deducted by petitioner as an item of current expense offsetting current income for Federal income tax reporting purposes. The $27,000 was reported by petitioner on its Federal income tax return for the period ended October 31, 1958, as nontaxable income under section 337.

The world of professional baseball, made up of major and minor professional baseball leagues and their constituent clubs, is governed by a detailed set of agreements, rules, and regulations, most or all of which are codified in an annual publication entitled "The Baseball Blue Book." The parties stipulated relevant portions of the Baseball Blue Book for 1957. These provisions may be summarized in the following manner:

(a) Major league agreement—An agreement between the National and American Leagues of professional baseball (hereinafter sometimes called the major leagues) and their [then] 16 constituent clubs;

(b) Major league rules—A set of rules formulated pursuant to the major league agreement covering the operation of and relations between the National and American major leagues;

(c) Professional baseball agreement—An agreement between the National and American major leagues and the National Association of Professional Baseball Leagues (hereinafter sometimes called the minor leagues);

(d) Major League-National Association rules (hereinafter sometimes called M.L.–N.A. rules)—A set of rules formulated pursuant to the professional baseball agreement covering operations and relations between the major and minor leagues.

(e) National association agreement—An agreement and rules covering the operations of and relations between the various minor leagues and their minor league member clubs.

Under the rules of organized professional baseball, the purchase and sale of player contracts was regulated and controlled by a series of agreements and regulations governing the operations of and relations between the major and minor leagues. As a party to these agreements the P.C.L. was subject to the rules governing a category known as open classification.

The rules of organized professional baseball established a procedure whereby players of minor league teams could be selected by major league teams (hereinafter sometimes called the "player draft"). The consideration required under these rules for the selection of a player from an open classification league was $15,000. The rules provided, *inter alia*, that:

For the purpose of enabling players to advance in their profession, the contracts of National Association players shall be subject to selection from clubs holding title thereto by Major League clubs and by National Association clubs of higher classification upon the following conditions:

(a) Players whose contracts have been or hereafter are assigned outright to National Association clubs by Major League clubs shall be subject to selection without restrictions other than the following:

(1) One player's contract only may be selected each year from each Open Classification * * * club, except as hereinafter set forth in (4) below.

   *      *      *      *      *      *      *

(4) Any club may designate a player's contract as being subject to unrestricted selection. Selection of any such player's contract shall not preclude selection of the contract of any one other player as set forth in (1) * * * hereof.

(5) Contracts of players who have as Veteran Major League players * * * given written consent to the assignment of their contract to a National Association club, shall be subject to unrestricted selection at any and all selection meetings following such assignment * * *

(b) The contracts of all other players shall be subject to selection of Major League * * * clubs after such players have had the following experience with

a club or clubs of the National Association; service during each of five seasons if reserved by an Open Classification club; * * *

(c) A player shall be considered as having had a "season's service" for the purpose of this rule during any season in which he has been on the active list or otherwise under control of a National Association club or clubs 30 days or more * * *.

(d) Nothing in this rule shall make subject to selection the contract of a player who has waived selection rights under the Professional Baseball Agreement or Rules pursuant to contract with an Open Classification club.

Players on open classification teams had the right to exempt themselves from the player draft. The record does not disclose any player who so acted.

The M.L.–N.A. rules imposed a limit upon the number of players to which major and minor league clubs could hold title. The limitations upon open classification leagues were as follows:

Open Classification * * * clubs shall not have title to more than thirty-eight (38) player contracts at any time, including the contracts of players on the Active List, under reservation, and on optional assignment to other clubs, but excluding the contracts of players on the Voluntarily Retired, Disqualified, Restricted, Ineligible and National Defense Service Lists, which number must be reduced to twenty-four (24) active players by the opening date of the Major League season or of the particular league's own season, whichever is the later; and further reduced to twenty-one (21) active players from the 31st day of the playing season to twenty (20) days before the close of season each year, both inclusive.

The reason for this limitation was stated as follows:

Since the supply of skilled players is not equal to the demand, the Major Leagues shall strictly observe their own rule imposing a limitation upon the number of players on their clubs and the National Association clubs shall likewise be limited * * *.

The Major League-National Association rules provided that a uniform baseball player contract must be used within organized baseball. The relevant rule stated the following:

*Uniform Contract.* To preserve morale and to produce the similarity of conditions necessary to keen competition, the contracts between all clubs and their players in the Major Leagues shall be in a single form which shall be prescribed by the Major League Executive Council: and the contract between all clubs and players in the National Association shall be in a single form which shall be prescribed by the President of the National Association. No club shall make a contract different from the uniform contract, and no club shall make a contract containing a non-reserve clause except permission be first secured from the Commissioner in case of a Major League player, or from the President of the National Association in case of a National Association player. The making of any agreement between a club and a player not embodied in the contract shall subject both parties to discipline; and no such agreement, whether written or verbal, shall be recognized or enforced.

The uniform baseball player contract usually contained a "reserve clause" which reserved to the employing team the right to renew the employment for a succeeding year, subject to salary renegotiation.

Successive agreement to contracts containing reserve clauses would effect continued control over a player during his playing life. The parties stipulated a copy of a document entitled "Uniform Player Contract" and stipulated that it is representative of the player contract form used by the minor leagues. The following is contained in the uniform player contract:

On or before March 1 * * * of the year next following the playing season covered by this contract, the Club may notify the Player of its intention to renew this contract, by tendering him a contract for the term of such year, except that the compensation rate shall be such as the parties may then agree upon. * * * In the absence of agreement by the parties, the compensation rate shall be determined as provided * * * [below], but pending such determination the Player will accept the compensation rate fixed by the Club or else will not play otherwise than for the Club.

The Club's right to renew this contract * * * and all covenants, promises and representations of the Player have been taken into consideration in determining the amount payable * * *.

In case of dispute between the Player and the Club * * *, the same shall be referred to * * * [arbitration].

Major and minor league teams sometimes entered into an arrangement called a "working agreement." The M.L.–N.A. rules defined working agreement as follows:

A club may convey by written agreement to a club of higher classification the right to select the contract, or contracts, of one or more players for a specified consideration which in no event shall be less than $100.00 per contract selected. Such agreements shall be known as "working agreements" and shall be subject to approval by the Commissioner if between a Major League Club and a National Association club and by the President of the National Association if between National Association clubs.

*        *        *        *        *        *        *

Any selection made under working agreements granting the right to make selections of players' contracts must be made on or before October 1st of each year, * * *.

*        *        *        *        *        *        *

Working Agreements which contemplate the selection of player contracts from clubs of Class A or higher, * * * may be entered into upon terms and conditions satisfactory to the clubs concerned, provided that no provision of such agreement shall conflict with * * * [the above].

For the years ended 1949 and 1950, petitioner had a working agreement with the Brooklyn National League Baseball Club, Inc., for which it received $20,000 per year. For the years ended 1951 and 1952, petitioner had a working agreement with Pittsburgh of the national league, for which it received $27,500 per year. For the years ended 1955, 1956, and 1957, petitioner had a working agreement with Pittsburgh for which it received $20,000 per year.

The working agreement dated April 1, 1957, gave Pittsburgh the right to select, under certain conditions, the contracts of any and all players belonging to petitioner. It provided, *inter alia*, the following:

WORKING AGREEMENT

I

For and in consideration of the payment of the sum of $20,000.00 (Twenty Thousand Dollars) by Pittsburgh to Hollywood, Hollywood gives to Pittsburgh the right to select, subject to conditions set forth below, the contracts of any and all players (including the manager, if a player) now under contract or reservation to Hollywood or whose contracts may become the property of Hollywood during the term of this agreement and also the contracts of all players which now are or may become the property of Hollywood-affiliated clubs during the term of this agreement and thereby become selectable or otherwise subject to acquisition by Hollywood, and the consideration for this agreement is at the same time consideration for contracts selected under its provisions except as otherwise specified herein.

\*      \*      \*      \*      \*      \*      \*

(a) In the event of the termination of this agreement, Hollywood will retain title to the contracts of eight (8) players mutually agreeable to both parties or in lieu thereof the sum of ($15,000.00) Fifteen Thousand Dollars shall be paid to Hollywood by Pittsburgh.

(b) As to selections made by Pittsburgh under this agreement, Pittsburgh shall reimburse Hollywood at the time of selection for payments made by Hollywood in originally acquiring the selected players' contracts as free agents (bonuses) or by purchase or selection (draft) from clubs not affiliated with Pittsburgh independent of recommendation by authorized representative of Pittsburgh or other Pittsburgh-affiliated clubs.

(c) If during the term of this agreement authorized representatives of Pittsburgh or other Pittsburgh-affiliated clubs on behalf of Hollywood shall negotiate contracts with free agents providing for the payment of bonuses to such players, it is understood and agreed that Pittsburgh shall promptly reimburse Hollywood for such bonus payments provided that such payments, when payable on a contingent basis, have first been approved by Pittsburgh.

(d) Hollywood during the term of this agreement may not unconditionally release any player or assign outright the contract of any player without first giving Pittsburgh ten (10) days' written or telegraphic notice of its intention to release or assign such player's contract, within which ten (10) day period Pittsburgh may elect to exercise its right to select such contract or waive all right thereto.

II

The right of selection provided for in "I" above is to be exercisable by Pittsburgh on or before October 1, 1957, except as otherwise provided herein, and Hollywood upon receipt of notice of selection immediately shall assign outright to Pittsburgh the contracts of selected players. All players, whose contracts are selected under this agreement, however, shall remain with Hollywood until the close of its current season,—including all official post-season games, if any, unless otherwise agreed upon.

III

If during the term of this agreement Hollywood with Pittsburgh's approval shall enter into working agreements with clubs of lower classification, Pittsburgh shall reimburse Hollywood for all expenses incurred by Hollywood under such agreements.

## IV

The selection of Hollywood's field manager shall be subject to approval by Pittsburgh (but Hollywood solely shall be responsible for payment of said manager's salary).

## V

Hollywood shall train at a site of its own choosing and shall be responsible for all expenses incurred in connection therewith.

## VI

This agreement for the 1957 season shall be extended automatically for 1958 on the same conditions and terms as are set forth herein unless notice is given by either party of a desire to terminate this agreement as of October 1, 1957. Notice of such desire to terminate on the part of Hollywood shall be given to Pittsburgh on or before August 1, 1957. Should Pittsburgh desire to terminate the agreement it must notify Hollywood to that effect on or before September 1, 1957.

## VII

Pittsburgh agrees not to hold Hollywood liable for damages for failure to operate a baseball team at any time during the life of this agreement.

Although under the stated terms of the working agreement petitioner was only entitled to reimbursement for various costs of acquiring a player's contract, the general practice was that petitioner would be paid the fair market value for the sale of player contracts.[2] During at least 1957, the chairman of the board of directors of Pittsburgh and the chairman of petitioner's board of directors was the same man, Branch Rickey, and Pittsburgh owned approximately 25 percent of petitioner's voting stock. The Baseball Blue Book listed petitioner as "Connected with Pittsburgh."

Petitioner sold a total of 224 player contracts for a total consideration of approximately $799,800 from the year ended 1948 through the

---

[2] Robert H. Cobb (hereinafter sometimes called Cobb), former president of petitioner, explained the fact that petitioner received the fair market value for its players under the working agreement as follows:

"Q. Isn't it a fact that only due to the fact that Pittsburgh benevolently or otherwise helped you to survive in effect by purchasing players' contracts from you at high prices, so that you could offset [the] * * * tremendous loss [in 1956 and 1957]?

"A. That may be possible, but they realized and appreciated the cost of developing these players. * * * [I]t takes public relations, but if you happen to work with a club like the Dodgers, for instance, or like Pittsburgh where we had a very close association, they recognized your problem and they wouldn't hold you right to their working agreement."

Similarly, Paul Jeschke, former corporate secretary and business manager of petitioner testified as follows:

"Q. How were you able to obtain sales prices in excess of cost in your negotiations with Pittsburgh?

"A. Well, the working agreement is for a period of one year, and often, in order to assure a renewal in the working agreement, a fair market price of a player would have to be paid rather than the cost. You develop a reputation of being fair with someone, and if you paid the fair price for the ballplayer, your reputation was better, and you were able to get better working agreements."

year ended 1957. During this same period the petitioner purchased a total of 175 player contracts at a total cost of $561,450.

The following schedule reflects, in round figures, for the year ended 1948 through the year ended 1957, the receipts from the sale of player contracts, the number of sales and purchases, and certain expenses, such as the purchase price of player contracts, payments to free agents which were not reimbursed by major league teams holding working agreements with petitioner, net cost of player contract options and National Association commissions: [3]

| Fiscal year ending | Revenue from contract sales | Number of sales | Number of purchases | Expenses |
|---|---|---|---|---|
| 1948 | $84,500 | 19 | 17 | $114,900 |
| 1949 | 42,800 | 26 | 22 | 75,400 |
| 1950 | 98,500 | 18 | 17 | 64,600 |
| 1951 | 32,300 | 21 | 11 | 60,800 |
| 1952 | 40,850 | 14 | 15 | 103,800 |
| 1953 | 75,700 | 13 | 12 | 62,700 |
| 1954 | 123,000 | 35 | 31 | 98,900 |
| 1955 | 100,350 | 23 | 24 | 66,100 |
| 1956 | 125,600 | 38 | 21 | 33,400 |
| 1957 | 76,200 | 17 | 5 | 15,500 |
| Total | 799,800 | 224 | 175 | 696,100 |

Petitioner derived receipts from the sale of admissions to baseball games, concession items, advertising, radio and television broadcasting rights, as well as from the sale of baseball player contracts. The following schedule reflects (round figures) for the year ended 1948 through the year ended 1957, the revenues realized from the operations of the petitioner, exclusive of the receipts from player contracts, and the operation's expenses, exclusive of the purchase price of player contracts, net payments to free agents, net cost of player contract options, and National Association commissions:

| Fiscal year ending | Revenues | Expenses | Fiscal year ending | Revenues | Expenses |
|---|---|---|---|---|---|
| 1948 | $522,700 | $470,200 | 1954 | $528,400 | $483,100 |
| 1949 | 670,600 | 507,400 | 1955 | 499,800 | 441,000 |
| 1950 | 588,100 | 515,400 | 1956 | 397,900 | 452,900 |
| 1951 | 491,000 | 482,200 | 1957 | 361,600 | 442,400 |
| 1952 | 498,700 | 507,800 |  |  |  |
| 1953 | 485,400 | 459,100 | Totals | 5,044,200 | 4,761,500 |

[3] Petitioner acquired players through purchase from other teams, the addition of "free agents," who were sometimes paid compensation (termed by petitioner "player bonuses"), which compensation was sometimes reimbursed by major league teams holding working agreements with petitioner, minor league working agreements [1954 and 1955 only], and player contract options. A National Association commission is a fee paid to the National Association for the assignment of contracts.

Cobb testified as follows regarding expenses other than the cost of acquiring player contracts:

"Q. Of course, all of these expenses * * * are part of your overall baseball operations.

"A. Yes, sir, in the final result, in the final analysis, yes."

From at least the year ended 1948 through the year ended October 31, 1957, it had been the consistent accounting procedure of petitioner to return for Federal income tax reporting purposes the revenue realized from player contract sales as either a part of its gross receipts or as other income from business operations. During these years it was petitioner's consistent accounting practice to deduct as an annual expense for Federal income tax purposes the entire cost of player contracts purchased in each year.

The player contracts at issue were held primarily for sale to customers in the ordinary course of petitioner's business.

*Findings of Fact as to Issue 2. Regarding an Amount Paid to the P.C.L. Pursuant to the Transfer of the National League to the Los Angeles and San Francisco Areas*

For at least the period here in issue, organized professional baseball (hereinafter sometimes called entity, establishment, or monopoly baseball) was composed of two major leagues and several minor leagues. These leagues contained a varying number of teams and were under the jurisdiction of a commissioner of baseball, who presided at a "government of organized professional baseball office." The minor leagues were also under the jurisdiction of a president of the National Association.

Most or all of the basic agreements, rules, and regulations of entity baseball were codified in an annual publication entitled "The Baseball Blue Book." One such document was the "Professional Baseball Agreement" between the major and minor leagues which contained a provision subjecting the minor leagues to the jurisdiction of the commissioner of baseball to a specified extent. It stated that the commissioner of baseball had power:

To investigate * * * any * * * practice * * * suspected to be detrimental to the best interests of the national game of baseball * * * [and] * * *

To determine * * * what * * * action is appropriate * * * and to take such action against any party hereto, any Major League, or club connected with any Major League, or any National Association League or club connected with the National Association, or any individual, as the case may be.

and it noted that:

The Major and National Association Leagues severally agree to be bound by the decisions of the Commissioner, rendered in accordance with the provisions of this Agreement.

All contracts between Major Leagues, Major League clubs, National Association Leagues and National Association clubs and their officers. players and employees shall contain a clause by which the parties agree to submit themselves to the discipline of the Commissioner and to his decisions rendered in accordance with this Agreement.

The governing documents of monopoly baseball, including the "Professional Baseball Agreement," "Major League Rules," and "Major

League-National Association Rules," contained numerous provisions which were binding upon both the major and minor leagues. These included, among others, rules regarding uniform player contracts and the necessity of inclusion of reserve clauses, contract tender dates, disqualification of players from monopoly baseball in the event of failure of contract agreement with the reserving club, gifts for securing employment, the signing of high school students and American Legion junior baseball players, returning military personnel, the signing of free agents, the player draft and the return of selected players, the assignment of player contracts, optional assignments, restricted, disqualified, and ineligible player lists whereby the ineligible player would be barred from playing anywhere within establishment baseball, and uniform rules regarding the actual playing of baseball. Penalties for breach of some of these rules included the voiding of contracts, fines, and other action within the stated powers of the commissioner of baseball.

A "professional baseball executive council" was provided for in the professional baseball agreement. This council had assured major league voting control and was empowered to adopt and amend the rules, regulations, and agreements regarding contacts between the major and minor leagues.

The P.C.L. had the exclusive right to play monopoly baseball in certain areas of the west coast of the United States, including Los Angeles and San Francisco. This exclusive right to play establishment baseball in the relevant areas was inherent in the P.C.L.'s membership in the general system of organized professional baseball.

The member teams of the P.C.L. had derivative rights from the league under the general entity scheme of organized baseball. A franchise membership in the P.C.L. entitled the holder to operate a P.C.L. team within the territory controlled by the league and granted the right to play P.C.L. baseball as a member of the league. It afforded the franchise holder the right to play baseball, *inter alia*, in Los Angeles and San Francisco, which areas were the most profitable in the league. It bestowed on the member an equal share of the P.C.L. exclusive territorial rights within the baseball monopoly, including allocable rights to televise and radiocast games played against home teams in the P.C.L. area. It entitled the franchise holder to the privilege of being an equal partner in the league, including all league assets and property rights.

Separate, distinct, and divisible from rights derived from the P.C.L. franchise ownership were so-called territorial rights. The league territorial right was the right to play exclusive entity baseball in several areas. A team territorial right was the right to play home

games within a certain area, usually a city. Team territorial rights were recognized in the P.C.L. constitution.

The P.C.L. constitution provided that some of the teams were granted "exclusive territorial rights" over the city in which they were located. The Los Angeles Baseball Club had the "exclusive territorial right" for the vicinity of Los Angeles, Calif. The right of petitioner to play P.C.L. baseball in this area was recognized and limited under the P.C.L. constitution. Relevant portions of said constitution were as follows:

Article III. Membership

Section 1. This League shall consist of eight (8) clubs, and the membership shall not voluntarily be increased or decreased except by unanimous vote of all the members of the League. The clubs forming the League shall be located in the following cities, to-wit: Portland, Oregon; Seattle, Washington; Los Angeles, San Francisco, Oakland,* Sacramento and San Diego, California; but the location of any of the eight (8) clubs forming the League may be changed by a three-quarters vote of the directors of the League, provided that the resolution to change such location is offered by the director representing the club affected.

*Oakland club moved to Vancouver, B.C.

Section 2. For the purpose of providing continuous baseball in the City of Los Angeles, the Hollywood Club shall be located in the City of Los Angeles, and the Los Angeles Club for such purpose, shall have the right to enter into a lease with the Hollywood Club under such terms and for such times as the Los Angeles Club may elect, with the right to renew such lease from time to time. Such lease shall not convey any territorial rights, whatsoever, and shall not change, alter or abridge the exclusive territorial or other rights of the Los Angeles Club.

\*    \*    \*    \*    \*    \*    \*

Article IV. Admissions to and Changes of Membership

Section 1. Any club member of the League may ask the League for permission to dispose of its rights and franchise as a member of the League in that city in which its baseball club is operating, * * * Without the consent of the League such transfer cannot be made. * * *

\*    \*    \*    \*    \*    \*    \*

Section 4. A three-quarters affirmative vote of the members of this Pacific Coast Baseball League shall be required for admission to membership or for the approval of the transfer of a franchise or of the transfer of a majority of stock or ownership or interest of a member with the involved club having the right to vote. * * *

The following resolution was adopted at meeting of August 15, 1955:

BE IT, AND IT HEREBY IS, RESOLVED:

1. That if any club of this league moves from a city mentioned in Sec. 1, Art. III, of the PCL Constitution, in which its franchise is now operated, to another city, the city from which the club moved shall continue to be regarded as PCL territory as far as the PCL is concerned, and the PCL may allow any club of this league to move into such territory. * * *

2. That the club which vacated such territory shall have, for three years thereafter, the first right and option to reoccupy such territory, and thereby recover such territorial rights as it had therein prior to vacating same * * *.

### Article V.   Terminating Membership

Section 1.  This League may terminate the membership of any member and forfeit to this League such member's franchise, certificate of membership and players' contracts and reservations upon the affirmative vote of seven (7) members for the following causes: * * *

\*          \*          \*          \*          \*          \*          \*

### Article VIII.   Jurisdiction of Board of Directors

Section 1. (a) The Board of Directors shall have final jurisdiction within the League, subject only to such right of appeal to other baseball authority as may exist under any agreement to which this League then may be a party.

\*          \*          \*          \*          \*          \*          \*

### Article XIII.   Club Territorial Rights

Section 1. Every Club in the League shall have exclusive territorial rights in the city in which it is located, and for a distance of ten (10) miles in every direction from the corporate limits of said city into the territory adjacent to it; provided, however, that the Hollywood Club, its successors and assigns, shall have no territorial rights in the City of Los Angeles but shall operate therein solely to the extent and subject at all times to the terms and provisions of its lease agreement with the Los Angeles Club; and provided further, that the Oakland Club shall have no jurisdiction west of the westerly boundary line of the City of Oakland, and the San Francisco Club shall have no jurisdiction east of the easterly boundary line of the City of San Francisco.

Section 2. No visiting League Club, or any player under contract or reservation by a League Club, shall, under any circumstances, be allowed to play exhibition game, or any Club in such territory other than the League Club therein located, without the consent of the said local League Club, which, in the City of Los Angeles, shall for all times be the resident Los Angeles Club.

The Los Angeles Baseball Club and the petitioner's predecessor entered into an agreement dated July 29, 1938, which provided, *inter alia*, the following:

WHEREAS, the First Party owns and controls the franchise and territorial rights in said League in Los Angeles and adjacent territory, as specified and described in the Constitution of said League; and * * *

\*          \*          \*          \*          \*          \*          \*

1. In order to provide for the playing of continuous baseball in the City of Los Angeles and adjacent territory (including the area therein known as the Hollywood area) as defined in said Constitution of said League, during the scheduled seasons provided by said League, the First Party hereby grants unto Second Party, upon the terms and conditions hereinafter set forth, for the period of twenty (20) years from the date of the commencement of the 1938 scheduled baseball season of said League, the privilege of playing baseball in the said Hollywood area, such area, as aforesaid, being part of the territorial rights covered by the franchise of First Party in said League.

2. It is mutually understood and agreed that by granting such privilege for such twenty (20) year period First Party does not, in any respect, waive or relinquish any of the territorial rights it now holds from said League, or otherwise, and that except for said privilege so granted for said period upon said conditions, First Party reserves and retains all of its said territorial rights.

Accordingly, it is agreed that the First Party shall have full and exclusive control in determining all matters affecting generally such territorial rights, includ-

ing all phases of radio broadcasting, matters of public policy and matters of general business policy, providing that its control in determining matters of public policy and general business policy shall be exercised only in those situations affecting the public interest in, and the general good reputation and standard of, baseball as played in said League and within the territory covered by the franchise of First Party from said League (including the said Hollywood area) and shall not be extended to those situations pertaining only to personal management problems of Second Party in the conduct by it of its games or its baseball park. It is, of course, further agreed that if any receipts or revenue accrue in the exercise of such control of the territorial rights by the First Party, the Second Party shall be entitled to the same as provided in Paragraph 4 hereof, subject to the percentage due First Party in the instances therein specified.

\*     \*     \*     \*     \*     \*     \*

4. In consideration of the grant of such privilege and of the premises, Second Party agrees to pay First Party, during the said period of twenty (20) years, five per cent (5%) of the gross gate receipts (after deducting admission or similar taxes) for all scheduled baseball games of said League and for all exhibition and other baseball games participated in by the Second Party in the said Hollywood area \* \* \*. It is mutually agreed that all other receipts of Second Party for such games \* \* \* shall belong exclusively to the Second Party. \* \* \* Second Party may make such other use of its park and stage such other events therein as it sees fit and may retain all receipts and revenue therefrom, subject to the control of territorial rights of First Party as defined in paragraph 2 \* \* \*.

\*     \*     \*     \*     \*     \*     \*

12. It is mutually agreed that upon the termination of this agreement the parties hereto may by mutual consent extend said agreement for such period, if any, as they then agree upon.

The National Association Agreement contained certain rules and regulations governing territorial rights and radio and television broadcasting for minor leagues. Relevant provisions of said agreement were as follows:

TERRITORIAL RIGHTS. (a) Each league \* \* \* shall have control of its territory until its membership is terminated in the manner and form provided for in this Agreement.

(b) Territorial protection shall cover the entire area within the limits of each city in which a franchise is granted and, in addition, all territory within 10 miles in all directions from the city limits of the protected city, including the entire area of any town, city, or village of which any portion is located within the 10-mile area, provided the franchise holder operates a National Association club within such protected territory.

(c) Upon a league granting any person, firm or corporation membership in its league for the purpose of operating a baseball franchise in a city, such membership shall carry with it protected territorial rights for the area within said city limits and within the ten-mile area above referred to. Such rights shall continue during the life of said membership. \* \* \*

(d) No club member of any league party to this Agreement, nor any player under control of such club, shall be allowed to play or participate in any game of baseball played within the territorial limits of any club member of any other league party to this Agreement, without consent of the owner of the franchise operating in said territory and without consent of the president and directors of the league of which said protected club is a member, nor shall the right to

operate an additional franchise within such protected territory be granted to anyone without such consent.

\* \* \* \* \* \* \*

(f) BROADCASTING OR TELECASTING

(1) Each club of a member league shall have the exclusive right freely to authorize a broadcast or telecast of games played in its home park, except that a club shall not authorize a broadcast of such games to be made from a station located outside its home territory and within the home territory of another club of a member league.

(2) Nothing contained in paragraph (1) shall be deemed to limit the right of each club of a member league to authorize a broadcast or telecast of any or all of both its home and away-from-home games at any time from any station or stations located within its home territory \* \* \*.

(3) As used herein—

(A) The term "home territory" \* \* \* shall mean the territory included within the circumference of a circle having a radius of fifty (50) miles with its center at the baseball park of such baseball club.

\* \* \* \* \* \* \*

(4) Nothing contained in this rule shall be deemed to affect or limit—

(A) The ownership by each club of a member league of all right, title and interest in and to its games, \* \* \* or to affect or limit \* \* \* its exclusive right and privilege to sell, license, control, regulate and terminate the publication or dissemination by radio, television or otherwise of any news, reports, descriptions and accounts of any game or any part thereof, both within and outside its own territory.

In approximately the summer of 1957, the Brooklyn National League Baseball Club, Inc. (hereinafter sometimes called the Dodgers), which operated the Brooklyn Dodgers of the National League, decided to transfer operations from the New York City area to the Los Angeles, Calif., area. This decision was at least in part due to a failure of agreement with the city of New York regarding a baseball park site. The Dodgers then owned the California Baseball Club, Inc. (hereinafter sometimes called the Angels), which operated the Los Angeles Angels of the P.C.L. The Dodgers had purchased the Angels in approximately December of 1956 in order to be represented in the P.C.L. and to derive players from the Pacific Coast area.

In the late summer of 1957, after the Dodger decision to move, the National Exhibition Co. (hereinafter sometimes called the Giants), which operated the New York Giants of the National League, decided to transfer operations from the New York City area to the San Francisco, Calif., area. This decision was at least in part due to the cumulative effects of a falling attendance, an old baseball park with inadequate parking facilities, and the inability to acquire a new stadium or location. In the late summer of 1957, the Giants purchased the San Francisco Seals of the P.C.L. (hereinafter sometimes called the Seals), which had been operated by the San Francisco Bay Area Baseball

Club. The Giants intended to transfer to the San Francisco area at the time of this purchase.

The P.C.L. had the right, under the National Association Agreement, to exclude other minor leagues from playing entity baseball in the territory it controlled. The P.C.L. was required to abide by a different set of agreements, however, if a major league decided to acquire a portion of the P.C.L. territory. In order to be a part of the organized system of monopoly baseball, both the National League and the P.C.L. were required to abide by various agreements, rules, and regulations.

The major league rules required that the Dodgers and Giants obtain approval of the National League before they would be allowed to transfer areas:

In the case of a Major League Club transferring its franchise to a city not presently in the Major Leagues, approval for such change shall be confined to the League of which the Major League Club is a member.

They had to give proper notice of their intention to move to the commissioner of baseball:

A Major League club desiring to acquire a National Association territory must file notice of its intention to do so with the Commissioner between October 1st and October 31st (both inclusive).

The agreements, rules, and regulations of entity baseball required that "just and reasonable compensation" be paid in the event of an acquisition by a major league. No territory could be included in a major league until such compensation was paid. In the event that the proper procedures were followed and just and reasonable compensation was paid, a minor league could not refuse to allow a major league acquisition.

The Major League-National Association rules provided, *inter alia*, the following regarding such major league acquisitions of minor league exclusive rights to play monopoly baseball in certain areas:

(a) *Protection of National Association Territory.* No territory in which a National Association franchise is being operated under protection of the Professional Baseball Agreement or National Association Agreement shall be included in any Major League until such National Association League and National Association Club shall be paid such compensation as shall be mutually agreed upon as just and reasonable compensation for such action. A Major League club desiring to acquire National Association territory must file notice of its intention to do so with the Commissioner between October 1st and October 31 (both inclusive).

In the event of disagreement as to what constitutes just and reasonable compensation for such action, the Major League desiring to occupy the National Association territory shall notify the Commissioner of their desire and request that the just and reasonable compensation required to be paid, be determined by a board of arbitration. * * *

\* \* \* \* \* \* \*

The Board of Arbitration, after investigation and hearings, shall first determine the amount of just and reasonable compensation to be paid the National Association club for the drafting of its territory and shall record its determination in a written award signed by a majority of the members of the Board. After such determination and award to the National Association club, the member of the Board appointed by the National Association club shall forthwith be replaced by a member appointed by the National Association league, so that the National Association league will have two appointees to the Board. The Board shall then determine the amount of just and reasonable compensation to be paid the National Association league for the drafting of the territory and shall record its determination in a written award signed by the majority of the members of the Board. The Board shall notify the interested parties (National Association club and National Association league) of such award within ten days after reaching its conclusions. The findings of the Board shall be final and, unless the awards are complied with by the Major League club within 30 days after receipt of such notification, the territory shall remain National Association territory.

Within ten days after the findings of the board have been complied with, the National Association territory shall be considered Major League territory * * *.

There have been provisions regarding the acquisition of such minor league rights for several years. The following rule, in effect in 1945, was substantially similar to the original agreement between the major and minor leagues:

No city in which a club in the National Association is located, shall be included in the circuit of a major league unless such league shall pay to the league in the National Association of which such city may be a member the sum of $5,000, and unless the major league club in question shall pay to the minor league club in the said city such reasonable compensation for damage to its assets, as may be determined by agreement or fixed by the Commissioner.

In 1945 and previous years, there was little expectation that any major league team would desire to change territory, but as time progressed the minor leagues of higher classification became concerned about the low price of $5,000. It was increased to $50,000, but the concern continued, and the compensation was finally left to agreement, and in default of agreement, to the possibility of arbitration.

In October 1957, the Dodgers and Giants sent the following telegraphic notices, respectively, to the commissioner of baseball:

Pursuant to Major Leagjxx League—National Association Rule 1–A and to MXX Major League Rule 1–C–3, the Undersigned Major League Club Hereby Gives Notice of its Desire and Intention to Acquire, and to Include in the National League of Professional Baseball Clubs, the Terrioxx Territory Consisting of the City of Los Angeles, California, in which the Los Angeles Baseball Club of the Pacific Coast League is Now Being Operated as a National Association Franchise

Pursuant to Major-National Aseociation Rule 1(A) and to Major League Rule 1(C)(3) the Undersigned Major League Club Hereby Gives Notice of its Desire and Intention to Acquire and to Include in the National League of Professional Baseball Clubs the Territory Consisting of the City of San Francisco California in Which the San Francisco Bay Area Baseball Club of the Pacific Coast League is Now Operating a National Association Franchise

Both clubs later confirmed their notices by letter. These notices were acknowledged separately by the commissioner of baseball. In each of his telegraphic acknowledgments, the commissioner of baseball stated the following:

This Will Acknowledge Your Communication * * * In Which You Announce The Intent of Yourself and the National League to Acquire and to Include in the National League Territory Consisting of the City of Los Angeles, Calif. [San Francisco, Calif.] The Commissioners Office Has Duly Noted Your Communication and Has Notified the Pacific Coast League * * *. In This Connection I Would Call Your Attention to the Major League-National Association Rules and the Major League Rule Covering Such Draft of Territory. All Provisions and Procedure of These Rules Must be Observed.

The commissioner of baseball then telegraphically informed the presidents of the National Association, the P.C.L., the San Francisco Baseball Club, the Los Angeles Baseball Club, and the National and American Leagues of the notices and his acknowledgments.

By letter dated October 16, 1957, petitioner made demand for compensation. The letter stated, *inter alia*, the following:

YOU AND EACH OF YOU WILL PLEASE TAKE NOTICE, therefore, that in the aforesaid territory consisting of the City of Los Angeles there "is being operated," and for twenty (20) years last past has been operated, "under the protection of the National Association Agreement" and of the constitution of the Pacific Coast Baseball League, by the undersigned Hollywood Baseball Association, a "National Association franchise" and a Pacific Coast Baseball League franchise.

YOU AND EACH OF YOU WILL PLEASE TAKE NOTICE, also, that pursuant to the Professional Baseball Agreement, the Major League-National Association Rules, and the Rules of Procedure formulated by the Commissioner, the undersigned Hollywood Baseball Association does hereby file its demand for payment to the undersigned of "just and reasonable compensation" and to be included in any and all negotiations and proceedings to be held, or which may be held, respecting mutual argement or any other determination as to just and reasonable compensation to the undersigned for the aforesaid action, and to appear and be heard in person and be represented by legal counsel in any and all such negotiations and proceedings.

THIS DEMAND is made without prejudice to the right of the undersigned Hollywood Baseball Association to object to the purported arbitration set forth in the aforesaid Major League-National Association Rule 1 and to demand a right of the undersigned to participate in any arbitration proceedings which may be had respecting just and reasonable compensation to the undersigned for the aforesaid action of including in said National League of Professional Baseball Clubs the territory of the city of Los Angeles in which the undersigned is operating a National Association franchise.

The letter further stated that petitioner "understands on the basis of newspaper reports only, that the [sending of notice to acquire] action was taken after approval of same by the National League * * * pursuant to [the] major league rule[s]."

Interested parties of the P.C.L. had several meetings when they first learned that the National League intended to acquire the Los Angeles and San Francisco areas. Leslie M. O'Connor (hereinafter called O'Connor), former acting commissioner of baseball and former vice president and general manager of the Chicago White Sox of the American League, was president of the P.C.L. at this time. O'Connor, who was also an attorney, advised said interested parties that he knew of no precedent for the situation and suggested that the closest analogy was an eminent domain proceeding in the sense of a taking of property by a superior power. Due to his belief of the legal implications, he would not agree to the arbitration procedure contained in the Major League-National Association rules.

The parties were presented with two major problems. The first question was whether the Dodgers, who owned the P.C.L. Angels, and the Giants, who owned the P.C.L. Seals, would agree to continue to operate teams in the P.C.L. The parties were interested in keeping the P.C.L. alive and this question resolved itself into a search for suitable areas in which to locate the teams. The second question was whether they would be able to agree to an amount which constituted just and reasonable compensation under the rules of entity baseball. The P.C.L. would not submit to arbitration and would have litigated the question absent agreement.

A meeting between representatives of the P.C.L. and the National League was held in Sacramento in October or November of 1957. An offer of $50,000, which was the highest amount previously paid, was rejected by the P.C.L. The Sacramento meeting was inconclusive, and the parties agreed to meet later in New York, with the representatives of the National League paying for the expenses of the P.C.L. representatives.

Arrangements were eventually made for the Giants to operate a P.C.L. team in Phoenix, Ariz., the Dodgers to operate a P.C.L. team in Spokane, Wash., and for a new group of persons to operate a P.C.L. team in Salt Lake City, Utah, in place of the team operated in Hollywood by petitioner. The Dodgers and Giants agreed to pay for the cost of obtaining the Salt Lake City and Phoenix areas from other minor leagues for the P.C.L. Spokane was not a member of another league at that time.

Regarding the question of just and reasonable compensation, the P.C.L. took the position at the New York meeting that the compensation should be based upon the value of the areas for the playing of major league baseball. The P.C.L. argued that such value would be best evidenced by the attendance, receipts, and profits which the National League teams would derive in the relevant areas. The P.C.L. suggested that payment in the form of 25 cents per admission at San

Francisco and Los Angeles for a period of 3 years would evidence the value. After negotiations, the P.C.L. reduced the suggested amount to 15 cents, but the representatives of the National League refused to agree to any payment derived from a computation depending upon admissions.

Since the National League refused to agree to payment based upon admissions, the parties negotiated thereafter on the basis of a stated amount. They finally agreed upon the sum of $900,000 to be paid to the six P.C.L. clubs which were not owned by either the Dodgers or Giants, or $150,000 per team. The $900,000 figure may have been determined by computing 15 cents an admission on a million net admissions per major league team for each of 3 years. But the figure was not based upon the number of admissions which the representatives of the P.C.L. believed that the Dodgers and Giants would attain, since they contemplated approximately 2 million admissions per year per team. A factor in the determination of amount may have been the desire of the National League to avoid litigation.

The parties were concerned with keeping the P.C.L. alive. As an inducement to continued operation, the payment of the $150,000 per team was spread over 3 years in 5 monthly payments per year. This method was agreed upon so that the teams would have funds available in each period.

Throughout the negotiations, the P.C.L. viewed the National League as the other party rather than the Dodgers and Giants. The P.C.L. was unwilling to negotiate unless it was understood that in the event of failure of agreement, suit would be brought against the National League and not the Dodgers and Giants.

The parties viewed the relevant transaction as a forced sale of property in which the P.C.L. and its members had formerly owned the property rights flowing from the exclusive right to play entity baseball in the relevant areas and then had sold them to the National League. They believed that they were selling the right to play games against teams situated in Los Angeles and San Francisco within the establishment system and the right to broadcast and telecast games originating in those areas to their other areas.

Separate, but substantially identical, letter agreements dated January 27, 1958, were entered into between the P.C.L., its member teams, and the Dodgers and Giants, respectively. They provided, *inter alia*, the following:

Gentlemen:

Negotiations have been conducted between you and the undersigned Pacific Coast Baseball League (hereinafter called "PCL") and the undersigned six clubs of the PCL: Hollywood Baseball Association, Portland Baseball Club, Inc., Sacramento Baseball Association, Inc., San Diego Baseball Club, Seattle Rainier

Baseball Club, and Vancouver Mounties Holdings, Ltd. (hereinafter called "the SIX CLUBS"), concerning claims of PCL and the SIX CLUBS for damages arising out of inclusion of San Francisco [Los Angeles], California, in the National League of Professional Baseball Clubs and the transfer of your National League Club to San Francisco [Los Angeles]. This will confirm our agreement on this matter, as follows:

1. In consideration of our agreements under paragraph 2 hereof, you agree to pay the following sums:

    *      *      *      *      *      *      *

(b) The sum of $25,000 payable to each of the SIX CLUBS in each of the years 1958, 1959 and 1960, said sums to be paid to the PCL as agent for each of the SIX CLUBS in installments of $5,000 each on the 1st days of February, May, June, July, and August, 1958 and in equal installments of $5,000 each on the 1st days of May, June, July, August and September in each of the years 1959 and 1960.

2. In consideration of the foregoing agreements on your part:

(a) The PCL and the SIX CLUBS hereby jointly and severally release and forever discharge you from all claims, damages and causes of action of every nature and description (except those arising out of any future breach of this agreement) which the PCL and the SIX CLUBS, or any of them, have or may claim to have against you by reason of or arising out of the inclusion of San Francisco [Los Angeles] in the National League of Professional Baseball Clubs and the transfer of your National League Club to San Francisco [Los Angeles].

(b) The PCL and each of the SIX CLUBS hereby waives and releases (and the PCL undertakes on behalf of each of its other members then belonging to the PCL to cause them to waive and release) all claims, damages and causes of action which the PCL and its members, or any of them, may hereafter have or claim to have against you by reason of or arising out of the location of, or the playing of games by, your National League Club at any place within, or within 25 miles of, the present city limits of San Francisco [Los Angeles] during any of the years 1958, 1959 and 1960.

3. Each and all of the foregoing agreements, releases and undertakings shall be binding upon the successors and assigns of each party to this letter agreement.

Your acceptance upon a copy of this letter shall constitute this letter an agreement between us and effectuate all its terms.

These agreements were signed by the president of the P.C.L., the president of each of the interested six P.C.L. clubs and accepted by the president of either the Giants or Dodgers, as appropriate.

Petitioner entered into an agreement dated December 18, 1957, with a newly formed organization known as the "Salt Lake City Baseball Corporation" (hereinafter sometimes called Salt Lake). Petitioner agreed to sell its franchise and membership in the P.C.L., equipment, and certain baseball player contracts, subject to the Pittsburgh working agreement. The stated consideration was $105,000, with $5,000 of said $105,000 specifically allocated to equipment. Of the remaining $100,000, $56,000 was for player contracts and $44,000 was for the franchise and membership in the P.C.L. Similar sales in years prior to the National League acquisition brought substantially higher amounts. Petitioner did not sell its rights in the Los Angeles and San

Francisco areas and it retained its allocable ownership of said areas within entity baseball. The December 18, 1957, agreement provided *inter alia*:

Nothing in this Agreement shall be understood or construed as a covenant to assign, or as assigning, to SALT LAKE any other property or rights of Hollywood, or of PCL, and particularly (but not limited to) any rights, claims or interests of HOLLYWOOD or PCL in any compensation or damages which may now or hereafter be due or payable to Hollywood or PCL in connection with inclusion of the baseball territories of Los Angeles and/or San Francisco in the National League of Professional Baseball Clubs.

The agreement was made specifically contingent upon several conditions, including P.C.L. approval of the transfer and P.C.L. membership for Salt Lake, the execution of a working agreement between Pittsburgh and Salt Lake upon terms substantially equivalent to the Pittsburgh-petitioner working agreement, and action of the municipality of Salt Lake City regarding the leasing and improvement of a baseball stadium.

On its Federal income tax return for the period ended October 31, 1958, petitioner reported its allocable share of the $900,000 payment ($150,000) as within the purview of section 337. The $150,000 was listed after the descriptive designation "P.C.L. Sale of Franchise Rights," with the date of sale listed as January 27, 1958. The accountant who was responsible for the terminology employed on the return and for scheduling this item as nontaxable, obtained his information from books and records of petitioner and from discussing the transaction with the business manager-comptroller and president of petitioner. The petitioner's ledger described the amount received from the Dodgers and Giants as "PCL Indemnity." The accountant did not examine the relevant agreements of January 27, 1958.

The P.C.L., and allocably the petitioner, sold valuable property to the National League, including all rights and prerogatives flowing from the P.C.L. exclusive privilege of playing monopoly baseball in the Los Angeles and San Francisco areas.

*Findings of Fact as to Issue 3. Regarding Organizational Expense*

According to the books and records of Investment, later known as petitioner, 416⅔ shares of Investment stock were issued on December 31, 1940, as promotional shares to the following named officers:

|  | Shares |
|---|---|
| Robert H. Cobb | 198⅓ |
| Victor F. Collins | 198⅓ |
| James Warren | 20 |
|  | 416⅔ |

The promotional shares issued to Cobb were in connection with efforts and negotiations involving the obtaining of a ball park, baseball players, a concession lease, and the hiring of employees, and also regarding efforts in soliciting purchasers of the stock of Investment. The promotional shares issued to Victor F. Collins (hereinafter called Collins) were in connection with legal services regarding the formation of Investment and efforts in soliciting purchasers of the stock of Investment. The promotional shares issued to James Warren (hereinafter called Warren) were in connection with assisting Cobb and Collins. Dividends were paid on this stock and it carried voting rights. There was no agreement to sell the stock, and it was escrowed under a condition requiring the consent of the commissioner of corporations before it could be transferred.

The promotional shares were issued in the ratio of a certain number of promotional shares for every so many shares previously issued and outstanding. They were capitalized on the books and records at $100 per promotional share (the stated par value of Investment's stock). The total capitalized amount for the 416⅔ shares was therefore $41,666.66. This amount was carried on the books of petitioner as an organizational expense throughout the life of the corporation, and petitioner's audit reports usually listed said amount as an asset opposite the description "organization expense-promotion stock." The item was listed as "promotion expense" in the "other assets" portion of the balance sheet attached to most or all of the Federal income tax returns filed by Investment and its successor, the petitioner herein. In addition to the 416⅔ promotional shares, there were issued 1,660 shares which were sold for $100 each, for a total of $166,000.

On its final return for the period ended December 16, 1958, petitioner claimed a deduction of $41,666.66 for "organization expense." In listing this deduction the accountant, who was employed to audit petitioner's books and records and prepare returns for the period of liquidation, simply adopted the terminology set forth in the books, records, prior audit reports, and prior tax returns.

Petitioner sustained a properly deductible $15,000 organizational expense on dissolution.

OPINION

*Issue 1. Regarding Whether Amounts Received for the Sale of Certain Baseball Player Contracts Are Within the Purview of Section 337*

The first issue is whether gain realized by petitioner from the sale of certain baseball player contracts to Pittsburgh is within the nonrecog-

nition provisions of section 337.[4]   Respondent contests the application of section 337 on two grounds: He asserts that the player contracts are excluded from section 337 by the terms of section 337 (b) (1) (A) and he avers that some of the relevant contracts were sold prior to the adoption of the plan of liquidation.   Since we find for the respondent on the first ground we need not consider the latter theory.

Section 337 is a relief provision which is designed to eliminate the difference in corporate tax consequence which formerly depended upon whether a corporation or its shareholder sold a liquidating corporation's assets.   S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 258–260 (1954) ; H. Rept. No. 1337, 83d Cong., 2d Sess., pp. A106–A109 (1954).   Cf. *Commisioner* v. *Court Holding Co.*, 324 U.S. 331; *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451.   Gain realized is therefore not recognized at the corporate level if the sale complies with the provisions of section 337.

The limited purpose of providing parity of treatment for unusual sales in liquidation would not be served by granting nonrecognition for gain which is derived from ordinary sales in the ordinary course of a corporation's business.   Hence, unless "inventory-type" assets are sold in bulk, gain from property held for sale to customers in the ordinary course of a corporation's business is excluded from the nonrecognition relief.   This is accomplished by granting nonrecognition to corporate "property" in section 337 (a) and then stating in section 337 (b) (1) (A) that:

the term "property" does not include—

(A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business,

---

[4] SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.
    (a) GENERAL RULE.—If—
        (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and
        (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,
    then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.
    (b) PROPERTY DEFINED.—
        (1) IN GENERAL.—For purposes of subsection (a), the term "property" does not include—
            (A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business, * * *
                *       *       *       *       *       *       *
        (2) NONRECOGNITION WITH RESPECT TO INVENTORY IN CERTAIN CASES.—Notwithstanding paragraph (1) of this subsection, if substantially all of the property described in subparagraph (A) of such paragraph (1) which is attributable to a trade or business of the corporation is, in accordance with this section, sold or exchanged to one person in one transaction, then for purposes of subsection (a) the term "property" includes—
            (A) such property so sold or exchanged, * * *.

This exclusion of "inventory-type" assets has its counterpart in section 1221(1)[5] which creates an exclusion from capital gains treatment by the use of words which are essentially identical to those contained in section 337(b)(1)(A). The only differences are the section 337 utilization of the specific "corporation" rather than the generic "taxpayer" and the use of the conjunction "and" rather than "or." Since section 337 is by its terms limited to corporations, the difference between "corporation" and "taxpayer" is of no significance; nor is the use of the conjunction "and" for "or." The essential identity of terms is matched by the similarity of purpose. Section 1221(1) excludes certain matter from a relief provision because Congress intended that profits and losses resulting from the sale of "inventory-type" assets should not be granted capital gains treatment. *Rollingswood Corp.* v. *Commissioner*, 190 F. 2d 263 (C.A. 9), affirming a Memorandum Opinion of this Court. Cf. *Corn Products Co.* v. *Commissioner*, 350 U.S. 46. Similarly, section 337(b)(1)(A) excludes essentially identically articulated matter from a relief provision because Congress intended that income from the sale of "inventory-type" assets should not be granted nonrecognition from corporate-level taxation. "It is intended that, during the 12-month period, sales in the ordinary course of business shall result in ordinary gain to the corporation as if the corporation were not in the process of liquidating." S. Rept. No. 1622, 83d Cong., 2d Sess., p. 259 (1954). See also H. Rept. No. 1337, 83d Cong., 2d Sess., pp. A106–A109 (1954). Judicially developed concepts and interpretation regarding section 1221(1) are clearly applicable in analysis of section 337(b)(1)(A). *Jeanese, Inc.* v. *United States*, 227 F. Supp. 304 (N.D. Cal.).

Whether the gain realized from the sale of the relevant baseball player contracts to Pittsburgh pursuant to the working agreement is excluded from section 337 nonrecognition relief by section 337(b)(1) (A) depends upon whether petitioner has sustained its burden of proving that the contracts were not held primarily for sale to customers in the ordinary course of petitioner's business. The purpose for which petitioner held the property is a question of fact which must be determined from the entire record. See *Carlson* v. *Commissioner*, 288 F. 2d 228 (C.A. 7), affirming a Memorandum Opinion of this Court; *Bauschard* v. *Commissioner*, 279 F. 2d 115 (C.A. 6), affirming 31 T.C. 910; *McMillan Mortgage Co.*, 36 T.C. 924; *D. L. Phillips*, 24 T.C. 435; *S.E.C. Corporation* v. *United States*, 140 F. Supp.

---

[5] SEC. 1221. CAPITAL ASSET DEFINED

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

717 (S.D.N.Y.), affirmed per curiam 241 F. 2d 416 (C.A. 2), certiorari denied 354 U.S. 909.

There are numerous cases which reach factual conclusions in this area, and they mention several criteria as being relevant, including the purpose for which the property was acquired, held and sold, the intent of the seller, and the volume, frequency, continuity, profitability, and substantiality of sales. Unlike many of the other situations, petitioner's purchase and sale of baseball player contracts was essential to its amusement business as well as being a source of profit in its own right, and the factual criteria must be considered in both lights. The ultimate question is whether one of the primary purposes for which petitioner held the relevant property was sale to customers in the ordinary course of business, and no single analytic criterion is necessarily determinative. *Meridian Inc.* v. *Commissioner*, 322 F. 2d 198 (C.A. 6), affirming a Memorandum Opinion of this Court; *Greene-Haldeman* v. *Commissioner*, 282 F. 2d 884 (C.A. 9), affirming 31 T.C. 1286; *Paul K. Ashby*, 37 T.C. 92; *Solly K. Frankenstein*, 31 T.C. 431, affd. 272 F. 2d 135 (C.A. 7), certiorari denied 362 U.S. 918; *S.E.C. Corporation* v. *United States, supra.*

Petitioner views our task differently and avers that we must find the major purpose for which the baseball contracts were held. It asks us to determine whether the purpose was to hold baseball player contracts for amusement income or for sale. But we need not choose between purposes since the statute denies nonrecognition to property "primarily" held for sale and it is well established that "primarily" does not necessarily mean "principal" or "chief." The requisite purpose is present if there is an essential or substantial holding for sale. Property may be held for more than one purpose and if one of the dual purposes is sale to customers in the ordinary course of business, the gain thereby derived may fail to qualify for nonrecognition relief. See *Recordak Corporation* v. *United States*, 325 F. 2d 460 (Ct. Cl.); *American Can Co.* v. *Commissioner*, 317 F. 2d 604 (C.A. 2), affirming on this point 37 T.C. 198, certiorari denied 375 U.S. 993; *Greene-Haldeman* v. *Commissioner, supra; Bauschard* v. *Commissioner, supra; Rollingwood* v. *Commissioner, supra; Municipal Bond Corporation*, 41 T.C. 20; *R. E. Moorhead & Son, Inc.*, 40 T.C. 704; *Estate of Peter Finder*, 37 T.C. 411; *Real Estate Corporation*, 35 T.C. 610, affd. 301 F. 2d 423 (C.A. 10), certiorari denied 371 U.S. 822; *Joseph A. Harrah*, 30 T.C. 1236; *S.E.C. Corporation* v. *United States, supra.* Congress did not intend to grant nonrecognition to sales in the ordinary course of business. S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 258, 259 (1954).

It is clear, then, that our task is to determine whether at least one of the essential or substantial purposes in holding baseball player contracts was sale to customers in the ordinary course of business. This

determination must be made on the basis of the record before us and with due regard to the petitioner's burden of proof. Petitioner's representatives often stated that they would have preferred to keep players so as to build a winning team. This is not necessarily inconsistent with a dual purpose to sell. In any event, the acme here is not a purpose which petitioner would have had in an unfettered situation; rather it is the purpose it actually had, and this must be found with due regard to the rules, regulations, and practices of organized professional baseball and the working agreements with major league teams that petitioner voluntarily entered into.

As set out in our findings, the rules of organized baseball required that petitioner hold open its player contracts for sale under certain procedures. Major league clubs could purchase any player contract which petitioner had held for 5 seasons (a season's service being defined as 30 days or more in any given year); one player could be drafted each year without restriction as to time of service if the contract had been assigned outright by a major league club; and petitioner could designate any player contract as being subject to unrestricted selection. Although petitioner's players had the right to exempt themselves from the draft, it is significant that the record does not disclose any attempt by petitioner to encourage such action or any player who took such action.

Further, the rules of organized baseball limited petitioner in the number of player contracts to which it could hold title. It could never hold title to more than 38, which number was reduced to 24 by the opening of the season, and which number was further reduced to 21 for the major portion of the season. Petitioner sold on the average of 22 player contracts in each of the years 1948 through 1957, although it could only retain 21 for the major portion of the season, and it similarly purchased on the average of 18 players per year during the same period with players also being acquired otherwise than by purchase.

Most significantly, the petitioner had entered into "working agreements" with major league clubs. During 1955, 1956, and 1957, it was a party to a working agreement with Pittsburgh. The 1957 agreement, for example, gave Pittsburgh:

the right to select * * * the contracts of any and all players (including the manager, if a player) now under contract or reservation to * * * [petitioner] or whose contracts may become the property of * * * [petitioner] during the term of this agreement and also the contracts of all players which now are or may become the property of * * * [petitioner] affiliated clubs during the term of this agreement and thereby become selectable or otherwise subject to acquisition by * * * [petitioner] * * *.

Hence the working agreements provided petitioner with a ready outlet and customer for the sale of its player contracts. Rather than

restrict the sale of its player contracts to the extent allowable under the rules of organized baseball, it contracted for consideration to sell any and all contracts Pittsburgh might desire. It received the fair market value for those that it sold to Pittsburgh, in addition to the $20,000 or more it received per year for the entering into the working agreement. The close connection between supplier and customer is emphasized by the fact that the chairman of the board of directors of petitioner was also the chairman of the board of directors of Pittsburgh. The record is inadequate regarding other reasons for entering into working agreements. Even if we assume that there were some reasons other than selling player contracts, the clear implication of the arrangement was that a primary purpose in holding the contracts was the sale to customers in the ordinary course of business.

Moreover, there was great volume, frequency, continuity, and substantiality of sales. From 1948 through 1957, petitioner sold 224 player contracts for a total consideration of approximately $800,000. In the fiscal period ended October 31, 1958, petitioner sold an additional eight contracts to Pittsburgh. Other than for 1958, the lowest number of sales per fiscal year was 13, the highest 38, and the average approximately 22.

Further, the petitioner derived a substantial profit from the sale of baseball player contracts. While there is no certain way of allocating expenses to income from the sale of contracts, since petitioner's overall operation was rather integrated, it is clear that a comparison of income to estimated allocable expenses shows a substantial profit. The approximately $100,000 of profit derived from the sale of player contracts during 1948 through 1957 compares quite favorably to the approximately $280,000 in all other profits during the same period. This is especially so when it is noted that the expenses for all other items was approximately seven times that of the estimated expenses for player contracts. Further, $155,000 was received for working agreements, an item intimately related to the sale of contracts. Too, petitioner derived $117,000 from such sales in the fiscal period ended October 1958. Note also that in the last 2 full years, 1956 and 1957, petitioner lost approximately $55,000 and $80,000, respectively, on its operations exclusive of baseball player contract sales. In these same years, petitioner gained approximately $90,000 and $60,000, respectively, from the sale of such contracts. Finally, the petitioner profited from sales of contracts in each of the last 5 years prior to 1958, that is, from 1953 through 1957. In these most relevant years to our determination, petitioner derived over $220,000 in profit from such sales.

It is evident from this record that petitioner is in error when it contends that the baseball player contracts were not essentially and substantially held for sale to customers in the ordinary course of business. We find that "the taxpayer had as one of its primary purposes

the ultimate sale" of the baseball player contracts "to its customers in the ordinary course of its business at the time it acquired the property, and that this intention continued, unaltered, while" the baseball players exhibited for petitioner "until customers purchased them." *Greene-Haldeman* v. *Commissioner*, *supra* at 887.

The legislative purpose of section 337 is a valid consideration regarding the instant issue, and the finding herein is consistent with that legislative purpose. "Equally material to a proper consideration of the question is a recognition of the fundamental objective of the * * * [statute]." *Paul K. Ashby*, *supra* at 97.

The statutory purpose of section 337 is to relieve and eliminate the formalistic difference reflected in *Commissioner* v. *Court Holding Co.*, *supra*, and *United States* v. *Cumberland Pub. Serv. Co.*, *supra*. This was accomplished by creating a parity of tax consequence which rendered immaterial the fact that a corporation sells assets in liquidation, or its shareholders sell assets after liquidation distribution. S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 258–260 (1954). There is absolutely no support in the legislative history or purpose for the proposition that section 337 is intended to provide nonrecognition for what would otherwise be ordinary corporate income derived from normal and usual nonbulk sales of corporate property.

It must be remembered that the petitioner continually reported the receipts from the sale of baseball player contracts as ordinary income and deducted in a single year the costs of such contracts. This practice of the income aspect was consistent with the contracts being held for sale in the ordinary course of business.[6] If nonrecognition were granted to such income, section 337 would be affording tax-free treat-

---

[6] This discussion need not be extended further due to our finding that the contracts here were held for sale in the ordinary course of business. We note without comment, however, that the Internal Revenue Service would apply a tax benefit theory to conclude that previously deducted amounts constitute ordinary income on the sale in liquidation of the allocable assets and would thereby deny section 337 nonrecognition. See Rev. Rul. 61–214, 1961–2 C.B. 60. Cf. sec. 1245, adopted Revenue Act of 1962; *Commissioner* v. *South Lake Farms, Inc.*, 324 F. 2d 837 (C.A. 9), affirming 36 T.C. 1027; *Family Record Plan, Inc.* v. *Commissioner*, 309 F. 2d 208 (C.A. 9), affirming 36 T.C. 305, certiorari denied 373 U.S. 910; *Commissioner* v. *Kuckenberg*, 309 F. 2d 202 (C.A. 9), reversing 35 T.C. 473, certiorari denied 373 U.S. 909; *Williamson* v. *United States*, 292 F. 2d 524 (Ct. Cl.); *Floyd* v. *Scofield*, 193 F. 2d 594 (C.A. 5); *Central Building & Loan Association*, 34 T.C. 447; Rev. Rul. 59–308, 1959–2 C.B. 110. Cf. also *West Seattle National Bank of Seattle* v. *Commissioner*, 288 F. 2d. 47 (C.A. 9), affirming 33 T.C. 341.

There may be some question regarding petitioner's practice of deducting in a single year the costs of the baseball player contracts, since the relevant contracts may have had a more than 1-year useful life. See and compare *Helvering* v. *Kansas City American Ass'n Baseball Co.*, 75 F. 2d 600 (C.A. 8), affirming a Memorandum Opinion of the Court; *Commissioner* v. *Chicago National League Ball Club*, 74 F. 2d 1010 (C.A. 7), affirming a Memorandum Opinion of the Court; *Commissioner* v. *Pittsburg Athletic Co.*, 72 F. 2d 883 (C.A. 3), affirming 27 B.T.A. 1074; I.T. 4078, 1952–1 C.B. 39; with *Indiana Broadcasting Corporation*, 41 T.C. 793; and *Westinghouse Broadcasting Co.*, 36 T.C. 912, affd. 309 F. 2d 279 (C.A. 3), certiorari denied 372 U.S. 935, and the cases therein cited at pp. 919–921; Rev. Rul. 54–441, 1954–2 C.B. 101. Note also that a question regarding whether salvage value equals or exceeds costs may arise. See *Massey Motors* v. *United States*, 364 U.S. 92; *R. E. Moorhead & Son, Inc.*, 40 T.C. 704, 712–713. We need not here meet the deduction question as it is not in issue.

ment from corporate income tax based on the insignificant fact that such income was derived within a 12-month period following adoption of a plan of liquidation. Rather than providing a parity of tax consequence in a *Court Holding Co—Cumberland Pub. Serv. Co.* situation, section 337 would be authorizing a pass-through of corporate ordinary income without corporate taxation. The relevant transactions were ordinary income sales to Pittsburgh pursuant to a working agreement, not extraordinary sales in liquidation. The purpose of section 337 would be offended by allowing nonrecognition in the instant case.[7]

Further, the reasoning of the Supreme Court in *Corn Products Co.* v. *Commissioner, supra,* is relevant. The Court held that hedging transactions were not to be afforded capital gains treatment because they constituted an integral part of the taxpayer's regular business. The inherent connection with regular business was determinative, since the Court reasoned that Congress did not intend that profits and losses from everyday business operations should be within the purview of the relief capital gains provisions. See also *Booth Newspapers, Inc.* v. *United States,* 303 F. 2d 916 (Ct. Cl.); *Hallcraft Homes, Inc.,* 40 T.C. 199; *McMillan Mortgage Co., supra,* and the cases therein cited; *Mansfield Journal Co.,* 31 T.C. 902, affd. 274 F. 2d 284 (C.A. 6); *America-Southeast Asia Co.,* 26 T.C. 198. This reasoning is applicable to the instant case, since the profitable sale of baseball player contracts was clearly an integral, inherent, and substantial part of the petitioner's business. We do not believe that Congress intended that profits arising from the everyday sale of such property should be within the purview of the relief nonrecognition section 337. Indeed, the instant case is clearer than *Corn Products Co.,* since we have here found that the relevant property was primarily held for sale to customers in the ordinary course of business within the terms of section 337(b)(1)(A). In *Corn Products Co.,* the Court stated that the property did not come within the corresponding predecessor of section 1221(1) and deemed sufficient in and of itself the inherent connection with the taxpayer's business.

We find for the respondent on this issue.

---

[7] "It is intended that, during the 12-month period, sales in the ordinary course of business shall result in ordinary gain to the corporation as if the corporation were not in the process of liquidating. * * * [S. Rept. No. 1622, 83d Cong., 2d Sess., p. 259]

"[The House version of sec. 337 is made] specifically inapplicable to a sale made in the ordinary course of the business of the corporation although such sale occurs after adoption of the plan of partial or complete liquidation. For example, if a corporation engaged in owning and operating filling stations were to liquidate * * *, the continued sale of gasoline to motorists during the course of winding up its business would still be considered to give rise to income taxable at the corporate level. [H. Rept. No. 1337, 83d Cong., 2d Sess., p. A107]"

*Issue 2. Regarding an Amount Paid to the P.C.L. Pursuant to the Transfer of the National League to the Los Angeles and San Francisco Areas.*

In the late summer of 1957, the Dodgers and Giants of the major National League decided to move their baseball organizations from the New York City area to the west coast area. The Dodgers made arrangements to move to Los Angeles and the Giants made plans to move to San Francisco. At this time, the P.C.L. controlled the Los Angeles and San Francisco areas regarding the playing of organized professional baseball. After negotiations, the National League acquired these areas for $900,000. Petitioner, which was one of the six P.C.L. teams not owned by the Dodgers or the Giants, received a one-sixth allocable share, or $150,000.

In the time between the commencement of the negotiations and the January 27, 1958, date of final agreement, petitioner adopted a plan of complete liquidation and it thereafter treated the $150,000 as a section 337 payment. Respondent did not question this treatment in the statutory notice of deficiency, but rather raised the issue for the first time, pursuant to section 6214(a),[8] in an amendment to his answer stating therein the following:

the $150,000 accrued by petitioner did not originate from the sale or exchange of property as required by Section 337(a) * * *. [It] was not entitled to the non-recognition treatment allowed under Section 337 * * *. [It] represented additional taxable income to petitioner for the taxable year ended October 31, 1958.

Rule 32, Tax Court Rules of Practice, entitled "Burden of Proof" states that:

The burden of proof shall be upon the petitioner, except as otherwise provided by statute, and except that in respect of any new matter pleaded in his answer, it shall be upon the respondent.

It is clear that respondent has the burden of proof on whether the relevant $150,000 "represented additional taxable income to petitioner."

Section 337 provides that "no gain or loss shall be recognized to * * * [the] corporation from the sale or exchange by it of property within * * * [the] 12-month period." Respondent has conceded that no timing question exists and the only remaining problem for this issue is whether there was a "sale" of "property."

The first question is whether the P.C.L. transferred "property" to the National League within the definition of section 337. It is clear

---

[8] SEC. 6214. DETERMINATIONS BY TAX COURT.

(a) JURISDICTION AS TO INCREASE OF DEFICIENCY, ADDITIONAL AMOUNTS, OR ADDITIONS TO THE TAX.—The Tax Court shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any additional amount, or addition to the tax should be assessed, if claim therefor is asserted by the Secretary or his delegate at or before the hearing or a rehearing.

that a monopoly was maintained regarding the playing of professional baseball in the United States.[9] The contracts, agreements, and rules of organized professional baseball have been reviewed in our findings and we need not repeat them here. What becomes evident is the fact that establishment major and minor leagues comprised an entity in which exclusive rights to play monopoly baseball in various areas of the United States were allocated to member leagues. Under the several governing contracts and documents of monopoly baseball, leagues and teams owned intangible contract and property rights which in part flowed from this exclusive privilege of playing establishment baseball in certain locations.

The P.C.L. was a member league of the organized baseball monopoly. It owned the exclusive right to play establishment baseball in certain areas of the west coast of the United States, including Los Angeles and San Francisco. Petitioner owned an allocable portion of this league right by dint of membership in the league. Flowing from the monopoly of organized baseball in the relevant region were several valuable property rights, including exclusive rights in this area to sell admissions to establishment baseball games, to sell concession items and advertising in this locale, to sell television and broadcast privileges regarding games played by home teams of this region, to develop players in this area, and to apply for major league status for this region.

As the Board of Tax Appeals stated in *J. S. F. Crayton*, 11 B.T.A. 1375, 1380:

Restriction of the meaning and scope of the term "property" as used in the taxing statutes may not be imputed. * * *

The reasonable and practicable interpretation of the statute is that it includes all forms of and interests in property whatsoever.

In the unique factual context herein presented, we find that the relevant intangible contract and property rights are "property" within the purview of section 337. See and compare *Fidelity & Deposit Co.* v. *Arenz*, 290 U.S. 66; *Lynch* v. *Alworth-Stevens Co.*, 267 U.S. 364; *Dorman* v. *United States*, 296 F. 2d 27 (C.A. 9); *Vermont Transit Co.* v. *Commissioner*, 218 F. 2d 468 (C.A. 2), affirming 19 T.C. 1040; *United States* v. *Jones*, 194 F. 2d 783 (C.A. 10); *Jones* v. *Corbyn*, 186 F. 2d 450 (C.A. 10); *Citizens State Bank of Barstow, Tex.* v. *Vidal*, 114 F. 2d 380 (C.A. 10); *George J. Aitken*, 35 T.C. 227; *Anton L. Trunk*, 32 T.C. 1127; *Henry J. Tully*, 28 T.C. 265; *Henrietta B. Goff*, 20 T.C. 561, affd. 212 F. 2d 875 (C.A. 3), certiorari denied 348 U.S. 829; *McCue Bros. & Drummond, Inc.*, 19 T.C. 667, affd. 210 F. 2d 752 (C.A. 2), certiorari denied 348 U.S. 829; *Louis W. Ray*, 18 T.C. 438, affd.

---

[9] See *Toolson* v. *New York Yankees*, 346 U.S. 356; *Federal Club* v. *National League*, 259 U.S. 200. Cf. *Radovich* v. *Nat. Football League*, 352 U.S. 445; *United States* v. *International Boxing Club*, 348 U.S. 236.

210 F. 2d 390 (C.A. 5), certiorari denied 348 U.S. 829; *Isadore Golonsky*, 16 T.C. 1450, affd. 200 F. 2d 72 (C.A. 3), certiorari denied 345 U.S. 939; *Walter H. Sutliff*, 46 B.T.A. 446; *William Zakon*, 7 B.T.A. 687; *Lawrence* v. *O'Connell*, 141 F. Supp. 316 (D. R.I.), affd. 238 F. 2d 476 (C.A. 1); *United States* v. *Graham*, 96 F. Supp. 318 (S.D. Cal.), affd. 195 F. 2d 530 (C.A. 9); sec. 1.337–3, Income Tax Regs.

Respondent contends that petitioner was devoid of salable property due to the expiration of the lease with the Angels regarding petitioner's right to play home baseball in Hollywood. It may be that petitioner had home team territorial rights in the Los Angeles area. While the lease was to expire at the beginning of the 1958 baseball season, there was a renewal clause and imminent contemplated renewal absent the acquisition. Petitioner's location in Hollywood was explicitly recognized in the P.C.L. constitution; the league was not empowered to change any team's home location without that team requesting a change; consent would be required before the Angels could enter into an agreement with a different team to play in Hollywood; and the Pittsburgh working agreement envisaged extension through the 1958 season. With respondent's burden of proof in mind, it may be that petitioner had certain "team territorial rights" in Los Angeles. But such a finding is not necessary to rebut the contention that petitioner was devoid of salable property. The P.C.L. owned the exclusive monopoly right to play establishment baseball within the Los Angeles and San Francisco areas, including all contract and property rights flowing therefrom, and, as an equal partner in the league, petitioner owned an allocable portion of this property right and was in fact paid its pro rata share without question.

Respondent further argues that petitioner had already transferred whatever property it may have owned when it sold its franchise, certain player contracts, and equipment to Salt Lake. What respondent fails to recognize is that the petitioner did not sell its allocable portion of the P.C.L. exclusive monopoly privilege in Los Angeles and San Francisco, including all property rights flowing therefrom, to Salt Lake. Rather, it retained this property and specifically included in the Salt Lake sale agreement the following provision:

> Nothing in this Agreement shall be understood or construed as a covenant to assign, or as assigning, to SALT LAKE any other property or rights of Hollywood, or of PCL, and particularly (but not limited to) any rights, claims or interests of HOLLYWOOD or PCL in any compensation or damages which may now or hereafter be due or payable to HOLLYWOOD or PCL in connection with inclusion of the baseball territories of Los Angeles and/or San Francisco in the National League of Professional Baseball Clubs.

Indeed, the exclusive monopoly privilege as to Los Angeles and San Francisco could not be transferred to Salt Lake, since the P.C.L. would

no longer own it when Salt Lake began to operate as a team. Further, the absence of the relevant property from the Salt Lake sale is emphasized by comparing the instant price to amounts previously obtained; the record establishes that sales prior to the National League acquisition brought substantially higher prices. Finally, respondent has not sustained its burden of proving that the various contingencies regarding the Salt Lake sale were satisfied before the January 27, 1958, acquisition by the National League and that the National League sale was not prior to the Salt Lake sale.

The final question is whether there was a "sale" of the relevant property within the purview of section 337. As used in the tax statute, sale generally is deemed to have its usual and customary meaning, "in accordance with the firmly established principle of tax law that the ordinary meaning of terms is persuasive of their statutory meaning." *Commissioner* v. *Korell*, 339 U.S. 619, 627–628; and see *Exolon Co.*, 45 B.T.A. 844. While "The essence of 'sale' is a transfer of the property in a thing for money," *Ratigan* v. *United States*, 88 F. 2d 919, 921 (C.A. 9), certiorari denied 301 U.S. 705, it is accepted that each situation must be decided on its own facts. See *Thornton G. Graham*, 26 T.C. 730; *Resthaven Memorial Cemetery, Inc.*, 43 B.T.A. 683; *Betty Rogers*, 37 B.T.A. 897, affd. 103 F. 2d 790 (C.A. 9), certiorari denied 308 U.S. 580.

We have decided that petitioner owned property and it is clear that it received a fixed price in money from the payor. The only question, then, is whether there was a "transfer" of the property. We believe that there was such a transfer. In this factual context, the P.C.L., and allocably the petitioner, transferred the exclusive right within monopoly baseball to play establishment baseball in the Los Angeles and San Francisco areas, including property rights flowing from said privilege. The rules of baseball and the parties continually used the term "acquire" regarding the transaction. The National League acquired the relevant property for consideration. Further, the payment was designated as "just and reasonable compensation" for the territorial privileges by the baseball rules and by the participants. Most importantly, the negotiations disclosed that the parties believed this to be a sale.[10] There is no doubt that the P.C.L. and petitioner divested themselves for consideration of all substantial rights in the relevant areas, and that the National League and the Dodgers and Giants thereafter owned all such rights. Viewing the respondent's burden of proof on this issue, we are unable to find that

[10] We have given great weight to the testimony of O'Connor, who was comparatively disinterested. Litigation wherein the payor was claiming a deduction for the payments and the Commissioner was claiming a sale of property was pending at trial time and the testimony of payor representatives must be viewed in this light.

the consideration was paid for future profit loss rather than for sale of property.

Respondent argued that the use of the term "damages" in the sale contracts established that there was no sale. "Damages" may have referred to property rather than respondent's averred profit damage. In any event, we are concerned with a factual determination which must be based on the entire record. The intent of the parties is to be gathered from not only the relevant instruments, but also from the attending facts and circumstances. *Resthaven Memorial Cemetery, Inc.*, *supra*, *Walter H. Sutliff*, *supra*. Further, the contracts were drawn by representatives of the payor. The P.C.L. and petitioner did not concern themselves with the terminology as they were primarily interested in obtaining the consideration. We believe O'Connor regarding the use of the term "damages":

Q. Who wrote these two agreements?

A. They were written by Mr. Carroll [a representative of the National League].

Q. Do you think they correctly set forth the actual agreement reached between the parties?

A. They correctly set forth, as far as to the $900,000 * * *. It is just compensation for the territory. It is not damages to the individual clubs. They were not even discussed, damages to individual clubs. If it had been discussed then the Sacramento ballclub would have been entitled to more than anybody else, but the subject of damages were not discussed at all. We said we don't care what you call it, whether you call it damages or rent or compensation or anything else, what we are interested in is operating a league and getting $900,000 and you can call it whatever you please. I also individually told them * * * they would not change the legal situation of the just compensation by calling it something else.

Respondent further averred that the transfer of the territorial rights to the National League was not a matter of choice; that the P.C.L. was required under the rules of monopoly baseball to agree to the acquisition. It is true that while the P.C.L. had an absolute right to exclude other minor leagues from playing establishment baseball in its territory, it was required to abide by monopoly baseball procedures and agree to major league acquisition in the event of proper notice and agreed-upon "just and reasonable compensation." We need not discuss the possible consequences of a failure to agree upon compensation. Even if the sale were forced, this does not rebut the fact of sale. Forced sales are no less sales in this context. See *Helvering* v. *Hammel*, 311 U.S. 504; *Hawaiian Gas Products* v. *Commissioner*, 126 F. 2d 4 (C.A. 9), affirming 43 B.T.A. 655, certiorari denied 317 U.S. 653; *44 West 3rd Street Corporation*, 39 T.C. 809, affd. 326 F. 2d 600 (C.A. 2).

The parties clearly intended that the payment be for property previously owned and not for replacement of estimated future income. During the negotiations the P.C.L. argued that the "just and reasonable compensation" should be based upon the value of the areas being

"acquired" for the playing of major league baseball. Due to National League refusal to base compensation on admissions, the flat sum of $900,000, or $150,000 per recipient club was agreed upon. At no time during the negotiations were amounts based upon anticipated future profit damage discussed. Indeed, the payment of a flat sum to each rebuts any individual team profit damage argument. The transaction was viewed as a sale of property in which the P.C.L. and its members transferred for monetary consideration property rights flowing from the exclusive right to play monopoly baseball in the Los Angeles and San Francisco areas.

There are several cases which make minute distinctions regarding "property" and "sale" in the area of capital gain vs. ordinary income treatment. Compare *Dorman* v. *United States, supra; Leh* v. *Commissioner*, 260 F. 2d 489 (C.A. 9), affirming 27 T.C. 892; *Hallcraft Homes, Inc.*, 40 T.C. 199, and the cases therein cited. Such decisions have emphasized that the congressional purpose regarding capital gains may at times result in denial of preferential treatment for transfers which would otherwise be deemed a sale of property. Thus the Supreme Court stated the following in *Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130, 134–135:

> While a capital asset is defined * * * as "property held by the taxpayer," it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. * * * Thus the Court has held that an unexpired lease, * * * corn futures, * * * and oil payment rights, * * * are not capital assets even though they are concededly "property" interests in the ordinary sense. * * *

See also *Corn Products Co.* v. *Commissioner, supra; Hort* v. *Commissioner*, 313 U.S. 28. The instant case, on this issue, is not concerned with an attempted conversion of ordinary income into capital gain. Rather, this issue involves the question whether a different tax consequence should result from the P.C.L. sale while petitioner owned the relevant property followed by liquidation distribution, as contrasted with liquidation distribution followed by P.C.L. sale when shareholders owned the property. The purpose of section 337 is to obviate such *Court Holding Co.—Cumberland Pub. Serv. Co.* distinctions. S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 258–260 (1954). See also discussion in Issue 1, *supra*. Hence in contrast to capital gain construction difficulties, the instant finding is thoroughly consistent with the purpose and intendment of section 337.

We find that the respondent has not sustained his burden of proving that the relevant payment was in lieu of future profit and was not for

a sale of property within the purview of section 337. Thus we need not consider petitioner's alternative contention which was based on the view that even if the payment was for damages, it was for property rather than profit damage. Petitioner argued that its basis in such damaged property would at least equal the payment and that no tax would therefore be due even if section 337 did not apply.

We find for petitioner on this issue.

### Issue 3. Regarding Organizational Expense

Petitioner's predecessor issued 416⅔ shares of stock to certain corporate officers as promotional shares in a ratio of a certain number of promotional shares for every so many shares previously issued and outstanding. The promotional stock was capitalized at the stated par value of $100 per share. Based upon this amount, a total sum of $41,666.66 was carried throughout the life of petitioner and its predecessor as an organizational expense. It was usually listed as an asset on the various corporate books and records.

The promotional shares were issued for legal services incident to corporate organization, efforts regarding the obtaining of a ball park, baseball players, concession leases and employees, and efforts pertaining to the solicitation of purchasers of the stock of petitioner's predecessor. Dividends were paid on the promotional stock; it carried voting rights; and there was no agreement to sell the stock. On its final return, petitioner claimed a deduction of $41,666.66 for "organization expense," which deduction the Commissioner now contests. Petitioner has the burden of proof on this issue.

Section 248, an elective provision in the 1954 Code which allows ratable deduction, is not here applicable, since the expense was incurred in years prior to the relevant statutory effective date. The applicable decisional law has established that organizational expenses are capital expenditures which may not be deducted in the year incurred but which may be deducted upon corporate dissolution, based upon the theory of corporate asset loss (now section 165). *Malta Temple Association*, 16 B.T.A. 409; *Emerson Electric Manufacturing Co.*, 3 B.T.A. 932.

Respondent does not contest the general right to deduct organizational expenditures on corporate dissolution, but avers that petitioner's predecessor never expended any property. He argues that the use of the corporation's own stock as payment did not constitute an expenditure, and hence no organizational expense deduction whatever should be allowed.

We do not agree that the use of a corporation's stock as payment rather than some other form of property effects a failure of expenditure. It is well established that a corporation may deduct the issuance

date fair market value of its stock when it is paid as compensation for services. *National Bellas Hess, Inc.*, 20 T.C. 636, affd. 220 F. 2d 415 (C.A. 8); *J. J. Hart, Inc.*, 9 T.C. 135; *Package Machinery Co.*, 28 B.T.A. 980. Indeed, the respondent has himself promulgated a ruling which states that a corporation may deduct the value of such stock payments. Rev. Rul. 62–217, 1962–2 C.B. 59. See also I.T. 2041, III–1 C.B. 392; I.T. 1197, I–1 C.B. 269. No purpose or reason supports a different conclusion regarding organizational expenditures.

In determining the amount of expense to be allowed, we must find the issuance date fair market value of the relevant stock and decide the extent to which it was paid for organizational items.

The record supports respondent's alternative contention that the issuance date fair market value of the relevant stock was less than the amount capitalized on petitioner's books. Utilization of the stated value of $100 per share resulted in a capitalized amount of $41,666.66. There were 2,076⅔ shares outstanding, including 1,660 which had been sold at $100 per share and 416⅔ promotional shares. We do not understand petitioner to seriously contest that approximately $80 per share, derived from dividing the total amount received by the total shares outstanding, is the maximum supportable estimation of issuance date fair market value. This amounts to about $33,300. An estimation of value is necessary, since "fair market value means the price at which a willing buyer and a willing seller would arrive, after negotiation for sale, where neither is acting under compulsion," *In re Williams' Estate*, 256 F. 2d 217 (C.A. 9), affirming a Memorandum Opinion of this Court. We have considered in this regard certain inadequacies in the record and petitioner's burden of proof on this issue.

It is also clear that only a portion of the claimed expense was closely connected with corporate organization. The record establishes that some of the relevant payment was for efforts regarding stock sales and expenditures related thereto. These are not deductible on dissolution. *Surety Finance Co.* v. *Commissioner*, 77 F. 2d 221 (C.A. 9), affirming 27 B.T.A. 616; *James I. Van Keuren*, 28 B.T.A. 480; *Pacific Coast Biscuit Co.*, 32 B.T.A. 39; *Emerson Electric Manufacturing Co., supra;* S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 37, 224 (1954).

Due to the inadequacy of the record, we must make an estimation and we have found that petitioner incurred a $15,000 organizational expense on liquidation. Cf. *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2).

Reviewed by the Court.

*Decision will be entered under Rule 50.*

BRUCE, *J.*, concurs in the result.

RAUM, J., dissenting: I have serious doubts as to the correctness of the Court's decision on the second issue. The question is whether there was a "sale" of "property" in respect of the share of negotiated compensation which petitioner received upon the advent of the two major league baseball clubs to California.

Granted that there were contractual arrangements that supported such payment, petitioner did not "sell" any "property" to those two clubs within the meaning of section 337, nor did they *buy* anything from petitioner. The $150,000 in issue was petitioner's one-sixth share of a total payment of $900,000 made for the benefit of all six minor league teams. That payment was in a sense intended to compensate petitioner and the other five teams, in some measure, for anticipated losses or reduction in future income as a consequence of the expected shift in public interest in the California area away from the minor league to the major league games. This was not a payment for "property." Petitioner did not sell its franchise to the major league clubs, for its team, as a result of an entirely different transaction, moved to Salt Lake City, where it continued to play minor league baseball. Certainly, the minor league teams outside of Los Angeles and San Francisco did not "sell" any "property" to the Dodgers or the Giants for their respective $150,000 shares, and I think that petitioner stands on no firmer foundation. Not everything that is sold is "property." Cf. *Estate of Grace M. Scharf*, 38 T.C. 15, affirmed 316 F. 2d 625 (C.A. 7). See also *Miller* v. *Commissioner*, 299 F. 2d 706, 709–710 (C.A. 2), affirming 35 T.C. 631; *Commissioner* v. *Gillette Motor Transport, Inc.*, 364 U.S. 130, 134. And I am also satisfied that the transaction herein cannot fairly be characterized as a "sale."

Section 337, upon which petitioner relies, grants an exemption from taxation and is not to be given an expansive reading. Plainly, the amount received would not qualify as proceeds of the sale of a capital asset under section 1221, and there is no reason to give the word "property" a broader meaning in section 337 than in section 1221. There is no justification for construing section 337 so as to allow nonrecognition of the gain in question at the corporate level and thus transmute what was ordinary income to the corporation into capital gain at the shareholder level.

The opinion of the Court places great, but I think false, emphasis upon "burden of proof" in respect of this issue. Whether the transaction, fully described in the evidence and findings, qualifies as a "sale" of "property" under the statute is a question of law, and the matter should not be obscured by reference to burden of proof. The latter is employed here as an improper crutch to support an erroneous result.

TIETJENS, PIERCE, and TRAIN, *JJ.*, agree with this dissent.