FAMILY RECORD PLAN, INCORPORATED (DISSOLVED), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

FAMILY RECORD PLAN, INCORPORATED, TRANSFEREE OF FAMILY RECORD PLAN, INCORPORATED (DISSOLVED), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 75771, 75790. Filed May 19, 1961.

*Harold Easton, Esq.*, and *Robert L. Spencer, Esq.*, for the petitioners.

*Jack E. Roberts, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined a deficiency in income tax for the period September 1, 1954, to February 28, 1955, and transferee liability as follows:

| | |
|---|---:|
| Family Record Plan, Incorporated (Dissolved), Docket No. 75771 | $411,641.70 |
| Family Record Plan, Incorporated, Transferee of Family Record Plan, Incorporated (Dissolved), Docket No. 75790 | 411,641.70 |

The sole question presented is whether the sale of accounts receivable comes within the nonrecognition of gain provisions of section 337 of the 1954 Code.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as stipulated.

The petitioner in Docket No. 75771, Family Record Plan, Incorporated (Dissolved), (hereinafter referred to as the transferor) was a corporation organized and existing under the laws of the State of California, with its principal place of business in Los Angeles, California. The transferor kept its records and filed its Federal income tax returns on the cash receipts and disbursements method of accounting. At no time did transferor elect to use the installment method of accounting as permitted under the Internal Revenue Code.

The petitioner in Docket No. 75790, Family Record Plan, Incorporated, Transferee of Family Record Plan, Incorporated (Dissolved), (hereinafter referred to as the transferee) is a corporation organized and existing under the laws of the State of California with its principal place of business in Los Angeles, California. At the time of its incorporation the company's name was F.R.P., Inc., but was later changed to Family Record Plan, Incorporated.

Throughout its corporate existence, transferor engaged in only one type of business. Through the medium of sales representatives in various parts of the United States it entered into contracts with customers which provided that transferor would furnish to the customer certain goods and services for a specified price. The items to be received by each customer were a leather album for keeping photographs, as well as the right, during a designated period of time, to have a specified number of photographs taken by a photographer to be selected from a list given to the customer. The photographers on this list had previously entered into agreements with the transferor to furnish the photographs free of charge. The price charged to the customer was to be paid by a specified downpayment at the time the contract was signed, with the balance payable in equal monthly amounts thereafter. All of the accounts receivable from customers which were owned by transferor on the date of its adoption of a plan

of liquidation and on the date when such accounts receivable were sold, arose as aforesaid from the business operations of transferor or its predecessor partnership.

On October 25, 1954, all of the outstanding capital stock of transferor was purchased by transferee. The purchase price paid for the stock was $1,120,000. Of the total purchase price of $1,120,000 paid for the capital stock of the transferor, the transferee allocated on its books an amount of not less than $800,000 as the cost attributable to the accounts receivable then owned by transferor.

The selling stockholders of the transferor had no proprietary or other interest in the corporation which purchased their stock (transferee), except as creditors for the payment of the balance of the purchase price. After October 25, 1954, they had no further interest in the transferor. Neither were they related by kinship, marriage, or otherwise to the stockholders of the purchasing corporation (transferee).

The purpose of transferee in purchasing the capital stock of transferor was to dissolve transferor and take over its assets.

On December 10, 1954, the board of directors of transferor adopted a plan of complete liquidation, which directed that transferor cease business, sell those assets which it wished to, and distribute the remainder of its assets, subject to its liabilities, to its stockholder. The sole stockholder (transferee) consented to the plan of liquidation on December 10, 1954. In compliance with this plan, transferor ceased business forthwith, and made no sales after December 10, 1954. On December 31, 1954, transferor filed with respondent Form 966, "Return of Information under Section 6043 of the Internal Revenue Code to be Filed by Corporations within 30 Days after Adoption of Resolution or Plan of Dissolution or Complete or Partial Liquidation."

On December 17, 1954, transferor sold, without recourse, all of the accounts receivable from customers then owned by it for the price of $800,000 payable $225,000 in cash at that time and $575,000 in deferred payments. The purchasers of the accounts receivable were Morton Smith and Doris Smith of Providence, Rhode Island, who were not employees, officers, directors, or stockholders of the transferor or the transferee. The accounts receivable thus sold consisted of approximately 49,000 accounts (including approximately 9,000 accounts theretofore turned over to collection agencies for collection) aggregating an unpaid balance of approximately $1,390,331.91 (including approximately $319,801.77 theretofore turned over to collection agencies for collection).

Payments on the $800,000 selling price of the accounts receivable were made to transferor and transferee as follows:

| Date of payment | | Amount |
|---|---|---|
| Check payable to and deposited by transferor: | | |
| Dec. 30, 1954 | | $225,000 |
| Checks payable to and deposited by transferee: | | |
| Jan. 31, 1955 | $245,000 | |
| Mar. 1, 1955 | 145,000 | |
| Apr. 1, 1955 | 140,000 | |
| Apr. 19, 1955 | 45,000 | 575,000 |
| Total | | 800,000 |

Subsequent to the sale of its accounts receivable, and by February 28, 1955, transferor distributed in complete liquidation to its sole stockholder (transferee) all of its assets, subject to its liabilities, and thereupon dissolved. In connection with this liquidation, on December 29, 1954, transferor executed a written assignment to transferee, transferring as of December 30, 1954, all of transferor's assets including the agreement of sale of accounts receivable. The fair market value of the assets transferred by the transferor to the transferee was in excess of $550,000.

Following the purchase of the stock of the transferor by the transferee the transferor did not hold stock in any corporation nor was said transferor utilized for the manufacture, construction, production, or purchase of any property with a view to the realization by its shareholders of gain attributable to such property other than as dividends.

In its final Federal income tax return for the period from September 1, 1954, through February 28, 1955, transferor did not recognize as taxable income any gain attributable to the sale of its accounts receivable. No part of the tax determined by respondent resulting from the sale of accounts receivable has been paid by transferor.

OPINION.

The transferee liability of the petitioner in Docket No. 75790 for any taxes which may be found due from the petitioner in Docket No. 75771 has been conceded.

The respondent has conceded that the transferor was not a collapsible corporation within the meaning of section 341 of the 1954 Code.

The sole question for decision is whether the sale of the transferor's accounts receivable comes within the nonrecognition of gain or loss provisions of section 337 of the 1954 Code. The problem resolves itself around whether or not the accounts receivable are installment obligations and thus excluded from the meaning of "property" as that term is used in section 337 (a).[1]

---

[1] SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan,

Section 337(b)[2] excludes installment obligations from the definition of property as used in section 337(a). However, the section contains no definition of "installment obligations." In its report with respect to section 337(b)(1) and (2), the Senate Committee on Finance stated:

Paragraph (2) of subsection (b) provides a special rule which would include inventory within the term "property" in any case in which substantially all of the inventory is, under section 337, sold or exchanged to one person in one transaction. In such case installment obligations acquired in respect of such sale or exchange are also included as property. *It is intended that, during the 12-month period, sales in the ordinary course of business shall result in ordinary gain to the corporation as if the corporation were not in the process of liquidating.* Your committee intends that where a bulk sale of the inventory assets is made at the beginning of the 12-month period, that no replacement of inventory or the acquisition of a new kind of inventory to conduct ordinary business for the balance of the 12-month period will be allowed. Thus, the bulk sale referred to will ordinarily be the last sale made by the corporation of its inventory. *Installment obligations arising out of sales in the ordinary course of business shall be treated as inventory.* [Emphasis added. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 259 (1954).]

It is petitioners' contention that the term "installment obligations" as used in section 337(b) has long been held to mean only those obligations resulting from the sale of property, as to which the seller has properly elected to report gain under the so-called installment method now provided for in section 453. Petitioners point out that as far back as 1931, the Internal Revenue Service distinguished between an installment obligation as to which the income was reported on the installment basis, and an obligation not so reported. G.C.M.

all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,
then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.
[a] (b) PROPERTY DEFINED.—
(1) IN GENERAL.—For purposes of subsection (a), the term "property" does not include—
(A) stock in trade of the corporation or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business,
(B) installment obligations acquired in respect of the sale or exchange (without regard to whether such sale or exchange occurred before, on, or after the date of the adoption of the plan referred to in subsection (a).) of stock in trade or other property described in subparagraph (A) of this paragraph, and
(C) installment obligations acquired in respect of property (other than property described in subparagraph (A)) sold or exchanged before the date of the adoption of such plan of liquidation.
(2) NONRECOGNITION WITH RESPECT TO INVENTORY IN CERTAIN CASES.—Notwithstanding paragraph (1) of this subsection, if substantially all of the property described in subparagraph (A) of such paragraph (1) which is attributable to a trade or business of the corporation is, in accordance with this section, sold or exchanged to one person in one transaction, then for purposes of subsection (a) the term "property" includes—
(A) such property so sold or exchanged, and
(B) installment obligations acquired in respect of such sale or exchange.

9114, X–1 C.B. 137 (1931).[3] Petitioners also point out that this distinction was made in *Joseph Frost*, 37 B.T.A. 190 (1938).[4] Based on this analysis, petitioners contend the accounts receivable sold by the transferor were not "installment obligations" since the transferor did not elect or use the installment method of reporting. On the contrary, petitioners contend that the transferor has always used the cash basis of reporting which, they argue, cannot give rise to "installment obligations."

We do not agree with petitioners' contention. The clear intent of Congress was that sales in the ordinary course of business would result in ordinary gain to the corporation as if it were not in the process of liquidating. If we were to adopt transferor's contention, a cash basis taxpayer would be able to sell merchandise on credit, then sell his accounts receivable acquired in the ordinary course of business and have no recognizable gain. Conversely, an accrual basis taxpayer or a taxpayer using the installment method under section 453 would have a recognizable gain in a similar transaction. Transferor's position is contrary to the intent of Congress and cannot be sustained. Insofar as petitioners' reliance on the language of *Joseph Frost*, *supra*, this is also misplaced. We said there that the contracts of sale were not installment obligations within the meaning of section 44(d) of the 1939 Code since the taxpayer was not using the installment basis. We did not say that the contracts were not installment obligations, but rather that they were not such within the meaning of section 44(d).

Petitioners contend that the source of the term "installment obligations" is in section 453(d) of the Code, which contains special rules for taxing gain or loss on disposition of installment obligations. These special rules impose limitations on the privilege of deferring tax through use of the installment method accorded by section 453(a) and (b) of the Code. Petitioners point out that these limitations were first contained in section 44(d) of the Revenue Act of 1928, with respect to which the House Ways and Means Committee report stated:

The installment basis accords the taxpayer the privilege of deferring the reporting at the time of sale of the gain realized, until such time as the deferred cash

---

[3] "* * * It appears that the term 'installment obligations' as used in section 44(d) contemplates an evidence of indebtedness of a purchaser acquired by a seller in connection with the sale of property, the income from which is reported on the installment basis. In the instant case, under the Revenue Act of 1924 the transaction was clearly a deferred payment sale of personal property not on the installment basis and was treated as a completed transaction in 1924. It is concluded, therefore, that the notes in the instant case do not constitute 'installment obligations' as that term is used in section 44(d). * * *" (G.C.M. 9114, X–1 C.B. 137 (1931).)

[4] "* * * The contracts of sale which the petitioner had were not installment obligations within the meaning and intendment of section 44(d), since he was not using the installment basis, and there would be no good reason to characterize them as installment obligations. The section was enacted as a part of the 1928 Act to prevent evasion under the installment method of reporting income [3] and was not intended to apply where some other unrelated method of reporting had been used. * * *" (Footnote omitted. 37 B.T.A. 190, 192).

payments are made. To prevent the evasion the subsection terminates the privilege of longer deferring the profit if the seller at any time transmits, distributes, or disposes of the installment obligations and compels the seller at that time to report the deferred profits. [H. Rept. No. 2, 70th Cong., 1st Sess., p. 16 (1928).]

Because of the special nature of obligations as to which the privilege of the installment method of reporting is elected, transferor points out that other Code provisions also contain special rules relating to them.[5]

In sections other than section 337, petitioners contend it is obvious that wherever the term "installment obligations" is used, it is used in its specialized sense under section 453. In each of the instances just cited, as well as others, the special tax treatment of an installment obligation required by the statute would not apply to an identical obligation as to which the installment method had not been elected. Thus, if an installment obligation is given away, the donor immediately realizes any previously unreported gain represented by the obligation, by reason of section 453(d). No such tax result obtains, however, if he gives away an obligation, identical in all respects except that the installment method of reporting was not elected with respect thereto.

We see little merit in this contention. If the term "installment obligations" was a phrase of art, no reference to section 453 would be necessary when it was used. It is significant that each time the phrase is used in sections 336, 381, and 691, there is a specific reference to section 453. However, when "installment obligations" was used in section 337(b) there was no reference to section 453. In view of the congressional intent expressed in the committee report set out above, we believe it clear that the term is not limited to situations where the taxpayer has elected to use the installment method.

Petitioners also rely on *Henry A. Kuckenberg*, 35 T.C. 473, 486, (1960),[6] to support their contention that the accounts receivable are not "installment obligations."

[5] Section 336 states, "Except as provided in section 453(d) (relating to disposition of installment obligations), no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation."

Section 381(c)(8) provides, "If the acquiring corporation acquires installment obligations (the income from which the distributor or transferor corporation has elected, under section 453, to report on the installment basis) the acquiring corporation shall, for purposes of section 453, be treated * * *."

Section 691(a)(4) states, "In the case of an installment obligation received by a decedent on the sale or other disposition of property, the income from which was properly reportable by the decedent on the installment basis under section 453, if such obligation is acquired by the decedent's estate * * *."

[6] "It seems to us that these facts, coupled with other facts stated in our findings, bring the gain realized from the sale of the three contracts within the nonrecognition provisions of section 337 of the 1954 Code. It certainly cannot be contended, we think, that contracts such as these sold to Simpson do not constitute property. Simpson certainly must have purchased them as property from which he expected to make a profit. The uncontradicted evidence is that Simpson realized a profit of $32,446.42 from the transaction. This profit would, of course, be taxable to him and not to the corporation. The property which these contracts represented, it seems to us, is not excluded from the nonrecognition of gain or loss provisions of section 337(b), printed in the margin."

In that case, we decided that three construction contracts were property within the meaning of section 337(a) and not excluded from the nonrecognition provisions by section 337(b). However, our opinion did not specifically consider whether those contracts represented "installment obligations," and we do not consider the decision in that case to be controlling here.

Petitioners point out that a well-settled rule has developed from numerous court decisions that if a parent corporation purchases the stock of a subsidiary corporation solely for the purpose of obtaining the subsidiary's assets, the transaction is treated as in substance the acquisition of the assets. Petitioners, therefore, contend the basis of the assets to the parent is the cost to it of the subsidiary's stock citing *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affd. 187 F. 2d 718 (C.A. 5, 1951), certiorari denied 342 U.S. 827 (1951), as authority for this proposition. Under this rule, it is contended the transferee in effect purchased all of the assets of the transferor for $1,120,000, the purchase price of transferor's capital stock. Petitioners contend that it has been established that the portion of this price allocable to the transferor's accounts receivable was at least $800,000 and since the receivables were sold shortly thereafter for $800,000, in substance, the assets were sold by the transferee, which realized no taxable gain thereon.

This contention has no merit. The facts show that the *transferor* and *not* the transferee sold the accounts receivable; therefore, the tax liability is attributable to the transferor. Even if we assume that petitioners' contention is correct, it is all the more evident that the transferor is liable for the tax due. If the transferee, in effect, bought the assets of the transferor, as contended, then necessarily there was a sale of the accounts receivable and since the transferor received cash, there was a realization of income. Transferee's liability arises only by reason of being a transferee and not by reason of the sale of the accounts receivable.

The transferor received only $225,000 of the $800,000, for which the accounts receivable were sold and the remaining $575,000 was received by the transferee. It is true that the transferor was on the cash basis, but a corporation being a separate legal entity, its net earnings, whether ascertained or not, belong to it, and the tax upon unexempt income in each taxable year is chargeable to it, and this liability cannot be discharged by the simple expedient of dissolution and the turning over of all its assets, including current and unreported income, to its sole stockholder, even though such corporation receives no money consideration for the transfer of such income. It is the actuality of income rather than its disposition that is important in determining the tax consequence. *Jud Plumbing & Heating* v. *Commissioner*, 153 F. 2d 681, 684 (C.A. 5, 1946).

In the ordinary case, a cash basis taxpayer who acquires the right to receive income is taxed when he receives it, regardless of the time when his right to receive payment accrued. But the rule that income is not taxable until realized has never been taken to mean that the taxpayer, even on the cash receipts basis, who has fully enjoyed the benefit of the economic gain represented by his right to receive income, can escape taxation because he has not himself received payment of it from his obligor. The rule, founded on administrative convenience, is only one of postponement of the tax to the final event of enjoyment of the income, usually the receipt of it by the taxpayer, and not one of exemption from taxation where the enjoyment is consummated by some event other than the taxpayer's personal receipt of money or property. Cf. *Aluminum Castings Co.* v. *Routzahn*, 282 U.S. 92, 98 (1930) ; *Helvering* v. *Horst*, 311 U.S. 112 (1940).

The express intent of Congress is clear. Accordingly, we hold that the accounts receivable are installment obligations within the meaning of section 337(b) and the gain on their sale is to be recognized.

Reviewed by the Court.

*Decisions will be entered for the respondent.*