LIBERTY NATIONAL BANK AND TRUST COMPANY, TRUSTEE OF OHARCO LIQUIDATING TRUST, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
LIBERTY NATL. BANK & TRUST CO. v. COMMISSIONER
Docket No. 6508-77.
United States Tax Court
T.C. Memo 1979-74; 1979 Tax Ct. Memo LEXIS 456; 38 T.C.M. (CCH) 314; March 5, 1979, Filed Frank D. Hill and Terry R. Hanna, for the petitioner. Thomas J. Miller,Charles N. Woodward and Robyn R. Jones, for the respondent. DAWSON
MEMORANDUM OPINION DAWSON, Judge: Respondent determined that petitioner was liable as a transferee for the following deficiencies in the Federal income taxes of Oharco Liquidating Company: Year
Deficiency
1971
$171,363.96
1972
22,398.64
1973
24,000.00
Taxable period
1/1/74 thru 5/31/74
749.69
The key issues for decision are: (1) Whether the $50,000 loss realized by the Oharco Liquidating Company on the sale of its trade accounts and notes receivable after adoption of a plan of liquidation under section 337 [1] may be recognized under the "installment obligations" exception in section 337(b)(1)(B); (2) whether Oharco Liquidating Company is entitled to deduct a loss of $428,500 as a result of a settlement regarding certain of the trade accounts and notes receivable previously sold. *460 This case was submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and joint exhibits are incorporated herein by this reference. The pertinent facts are summarized below. Liberty National Bank (hereinafter petitioner) is a national banking association with its principal place of business in Oklahoma City, Oklahoma. Petitioner is trustee pursuant to a Liquidating Trust Agreement dated January 31, 1974, between petitioner and Oharco Liquidating Company, an Oklahoma corporation which is successor to Oklahoma Hardware Company (hereinafter Oharco Liquidating Company and Oklahoma Hardware Company are referred to as Oharco). Oharco filed its corporate Federal income tax returns on the accrual method of accounting for the taxable year ending December 31, 1973, and for its final taxable year ending May 31, 1974, with the Internal Revenue Service Center, Austin, Texas. On June 15, 1974, Oharco filed with the Service Center an application for tentative refund from the carryback of a net operating loss to the taxable years 1971 and 1972. Since its incorporation in 1900, Oharco, with head-quarters in Oklahoma City, Oklahoma, *461 was engaged in the wholesale hardware business. Beginning in September 1972, the officers and directors of Oharco held discussions with representatives of B H & L Industries, Inc., (hereinafter B H & L), a Texas corporation, regarding the possibility of a sale of most of Oharco's assets to B H & L. Oharco and B H & L were unrelated parties and dealt at arm's length. During the course of negotiations it became evident to the parties that the trade accounts and notes receivable (hereinafter the Accounts) of Oharco constituted a substantial asset. As of December 31, 1971, the Accounts were reflected on Oharco's books at $3,269,775 less an allowance for doubtful accounts of $155,000 for a net sum of $3,114,775. All of the Accounts arose from the sale of merchandise and inventory in the ordinary course of the wholesale hardware business conducted by Oharco. Oharco had not elected to report income from the Accounts under the installment method permitted by section 453. Instead, the Accounts as they arose were included in the income of Oharco under the normal accrual rules. Oharco utilized the specific charge off method of accounting pursuant to section 166(a)(1) for its bad debts *462 for tax purposes. In negotiations regarding the price B H & L would pay for the Accounts, the parties focused on the $155,000 allowance for doubtful accounts. B H & L did not wish to accept a discount of less than this allowance and Oharco thought the allowance was excessive. As a compromise, the tentative proposal of B H & L to purchase the assets of Oharco provided that the Accounts would be sold at their face value less $50,000 but with $100,000 to be placed in escrow by Oharco to be paid to B H & L if, and to the extent, the Accounts later proved to be uncollectible in amounts exceeding $50,000. This provision was subject to the condition that Oharco furnish B H & L audited financial statements of Oharco as of December 31, 1972. On January 20, 1973, the Board of Directors of Oharco adopted a Plan of Complete Liquidation and Dissolution (hereinafter the Plan) pursuant to section 337. On February 2, 1973, the shareholders of Oharco approved the Plan and the proposed asset purchase by B H & L. On February 5, 1973, Oharco and B H & L executed a Letter of Intent with respect to the proposed transaction. On February 15, 1973, Oharco filed Form 966, Corporate Liquidation or *463 Dissolution, with the Internal Revenue Service. On February 22, 1973, Wolf & Company, certified public accountants for Oharco, issued its audited report of Oharco's balance sheet as of December 31, 1972. As a result, Oharco increased its allowance for doubtful accounts by $120,000 to $275,000. Accordingly, B H & L and Oharco agreed to modify the escrow agreement regarding the Accounts so $220,000 rather than $100,000 would be placed in escrow. On March 9, 1973, (hereinafter the closing date) Oharco and B H & L entered into a formal contract (hereinafter Purchase Agreement) effective January 1, 1973, which provided for the sale of substantially all of Oharco's assets and assumption by B H & L of Oharco's liabilities for a total price of $3,549,508. On the closing date Oharco received $1,258,938 in cash and a promissory note (hereinafter the B H & L Note) in the principal amount of $2,290,370 payable in three equal annual installments plus interest. Pursuant to the previous understanding, the Accounts were priced at their face amount less $50,000. The Purchase Agreement provided for the creation of an Escrow Agreement (Accounts) pursuant to which Oharco deposited in escrow *464 for a period of one year $220,000 for the benefit of B H & L to the extent the Accounts proved uncollectible in amounts exceeding $50,000. The Purchase Agreement also provided another escrow account in which Oharco deposited $200,000 for a period of two years to indemnify B H & L to the extent of any loss suffered as a result of breach of representation or warranties by Oharco (hereinafter Warranty Escrow Agreement). On March 13, 1973, Oharco filed Amended Articles of Incorporation with the Secretary of State of Oklahoma to change its name from Oklahoma Hardware Company to Oharco Liquidating Company. On March 28, 1973, Oharco filed its Statement of Intent to Dissolve with the Secretary of State of Oklahoma. Beginning in September 1973, B H & L expressed concern to Oharco regarding the collectibility of the Accounts. On October 8, 1973, representatives of B H & L and Oharco held a meeting to discuss the difficulty. At that time representatives of B H & L stated that the Accounts would be uncollectible in amounts substantially in excess of $270,000 (which constituted the principal balance of the Escrow Agreement (Accounts) of $220,000 plus the agreed discount of $50,000 from *465 the face value of the Accounts) and advised Oharco that B H & L had retained Price Waterhouse & Co., independent certified public accountants, to prepare a special report with respect to the Accounts. Because of unrelated financing transactions undertaken by B H & L, however, the B H & L Note was prepaid in full to Oharco on November 11, 1973. On November 29, 1973, Price Waterhouse & Co. issued to B H & L a special report with respect to the Accounts. As a result of failure of negotiations with B H & L, Oharco filed an action for declaratory judgment in the United States District Court for the Western District of Oklahoma on January 7, 1974. On January 9, 1974, B H & L notified Oharco that it claimed damages in excess of $1,200,000. On January 29, 1974, the shareholders of Oharco held a special meeting at which the terms of a proposed Liquidating Trust Agreement between Oharco, on behalf of its shareholders, and petitioner, as trustee, were approved. On January 31, 1974, Oharco and petitioner executed the Liquidating Trust Agreement. On the same day and pursuant to the Plan, Oharco executed a Conveyance, Transfer and Assignment (hereinafter the Conveyance) in favor of petitioner, *466 as trustee, under the Liquidating Trust Agreement. Immediately prior to the Conveyance, Oharco's assets included cash or cash equivalent of $1,298,000 and its rights under the two escrow accounts which held $420,000 plus approximately $15,000 accrued interest. Oharco's liabilities at that time included the contingent claim asserted by B H & L and its 1973 Federal and Oklahoma income tax liabilities. Under the Conveyance Oharco conveyed most of its assets to petitioner but retained certain amounts to cover claims against Oharco and related expenses. The Conveyance was made by Oharco without consideration from petitioner. As a result of negotiations between Oharco and B H & L, a Settlement Agreement was entered on April 5, 1974, pursuant to which all controversies between Oharco and B H & L were finally resolved. The dispute between Oharco and B H & L and its final resolution was based exclusively upon the value of the accounts on the date of the original sale of the assets. The Settlement Agreement was negotiated at arm's length and in good faith. The primary position asserted by Oharco throughout the negotiations had been that the limit of its liability to B H & L was $420,000, *467 the principal balance of the escrow accounts. B H & L had insisted upon payment in excess of such amount. The parties finally resolved the dispute by agreeing that Oharco would pay B H & L $528,500 and B H & L would transfer to Oharco certain of the Accounts. Oharco's decision to pay B H & L more than $420,000 was based upon its belief after investigation that some of the Accounts it would receive under the Settlement Agreement were collectible to the extent of approximately $100,000. Pursuant to the Settlement Agreement, Oharco paid B H & L $528,500 ($452,930.67 of which come from the escrow accounts) and dismissed the pending litigation for declaratory judgment. B H & L released Oharco from all liability and assigned certain of the Accounts to petitioner, as trustee. With respect to the Accounts assigned to petitioner, vigorous collection efforts have been pursued. As a result, to date petitioner, as trustee, has received $99,142.27 (net of costs of collection). On May 15, 1974, Oharco filed its 1973 Federal corporate income tax return in which Oharco claimed an ordinary loss of $50,000 upon the sale of the Accounts to B H & L. On May 28, 1974, Oharco closed all of its *468 bank accounts and transferred $1,750.99 to petitioner, as trustee. Such transfer was without consideration from petitioner. On June 15, 1974, Oharco filed its final Federal corporate income tax return for the period January 1, 1974, through May 31, 1974. On June 15, 1974, Oharco filed a claim for refund asserting net operating loss carrybacks which would result in refunds for the 1971 and 1972 taxable years of $171,363.96 and $22,398.64, respectively. As a result of the claim for refunds, Oharco received refund checks of $171,852.05 (1971 refund plus interest) and $22,518 (1972 refund plus interest) which were promptly endorsed and delivered to petitioner, as trustee. The delivery of the refund checks by petitioner was without consideration from petitioner. Although Oharco has not yet dissolved and liquidated pursuant to the laws of the State of Oklahoma, it has not engaged in the active conduct of a trade or business since the sale of its assets to B H & L. Instead, its activities have been limited to the resolution of claims and disputes under the Purchase Agreement and investment of funds through the exercise of its rights under the Liquidating Trust Agreement. On December 23, 1976, Oharco *469 and the respondent timely executed an agreement extending the period of limitation for assessment. On February 4, 1977, Oharco properly terminated this agreement. On April 7, 1977, a notice of liability, which disallowed the $50,000 loss on the 1973 return and the $414,366.06 deducted on the final return, was mailed to petitioner by respondent. Respondent did not issue a statutory notice of deficiency to Oharco for the taxes claimed due and made no effort to collect such taxes from Oharco. After the conveyance to petitioner on January 31, 1974, Oharco had insufficient assets to pay the tax deficiency set forth in the notice of liability mailed to petitioner. Section 337 [2] provides for nonrecognition of gain or loss realized on the sale or exchange of corporate property within the 12 month period after the adoption of a plan of complete liquidation if all of the corporate assets, less assets retained to meet claims, are distributed within that period. Section 337(b)(1)(B) provides an exception from the general rule of nonrecognition by defining property for purposes of section 337 to exclude "installment obligations" acquired in respect of the sale or exchange of stock in *470 trade, inventory or property held primarily for sale in the ordinary course of business. The first issue for our decision here is whether the $50,000 loss realized by Oharco on the sale of its Accounts after it adopted its plan of complete liquidation may be recognized under this exception as a disposition of an installment obligation acquired in respect of the sale or exchange of inventory. *471 We have addressed this issue before and each time have held that the sale of accounts receivable qualifies for recognition under the exception in section 337(b)(1)(B) as an installment obligation. See Coast Coil Co. v. Commissioner,50 T.C. 528, 532-35 (1968), affd. per curiam 422 F.2d 402 (9th Cir. 1970); Family Record Plan, Inc. v. Commissioner,36 T.C. 305, 308-13 (1961), affd. on other grounds 309 F.2d 208 (9th Cir. 1962), cert. denied 373 U.S. 910 (1963). In Family Record Plan, Inc., a taxpayer on the cash receipts and disbursements accounting method was in the business of selling photo albums for a price to be paid by a specified downpayment at the time the contract was signed and by equal monthly installments thereafter. See 36 T.C. at 306. After adopting a plan of complete liquidation under section 337 the taxpayer realized gain on the sale of its accounts receivable. Respondent argued in that case and we agreed that the accounts receivable were installment obligations within the meaning of section 337(b) and, consequently, the gain must be recognized. In reaching our conclusion *472 that the accounts receivable were encompassed by the term "installment obligations", we relied on the legislative history, S. Rept. No. 1622, 83d Cong., 2d Sess. 259 (1954): Paragraph (2) of subsection (b) provides a special rule which would include inventory within the term "property" in any case in which substantially all of the inventory is, under section 337, sold or exchanged to one person in one transaction. In such case installment obligations acquired in respect of such sale or exchange are also included as property. It is intended that, during the 12-month period, sales in the ordinary course of business shall result in ordinary gain to the corporation as if the corporation were not in the process of liquidating. Your committee intends that where a bulk sale of the inventory assets is made at the beginning of the 12-month period, that no replacement of inventory or the acquisition of a new kind of inventory to conduct ordinary business for the balance of the 12-month period will be allowed. Thus, the bulk sale referred to will ordinarily be the last sale made by the corporation of its inventory. Installment obligations arising out of sales in the ordinary course *473 of business shall be treated as inventory. [Empahsis added.] From this [3] we stated that the "clear intent of Congress was that sales in the ordinary course of business would result in ordinary gain to the corporation as if it were not in the process of liquidating." 36 T.C. at 310. Consequently, we declined to hold that "installment obligations" encompassed only those for which section 453 was elected since to do so would permit circumvention of congressional intent. Instead, we equated installment obligations with accounts receivable.
*474 In its affirming opinion the Ninth Circuit did not decide whether the accounts receivable constituted "installment obligations" within the meaning of section 337(b)(1)(B). Rather, the Ninth Circuit relied on the ground that respondent was entitled in the exercise of his authority under section 446(b) to disregard the taxpayer's cash receipts and disbursements method of accounting and to require recognition of the gain on the sale to clearly reflect income. Recognition was appropriate since "what was 'sold' was a right to receive income generated by Transferor in the regular course of its business, and nothing more, and receipt of $800,000 for that right was the receipt of income". 309 F.2d at 210. In Coast Coil Co. v. Commissioner,supra, the issue of whether "installment obligations" includes accounts receivable was again addressed, this time in a factual predicate similar to the instant case. The taxpayer in Coast Coil Co. employed the accrual method of accounting in its business of equipment sales. Some of its sales were on open account and were reflected on its books and tax returns as accounts receivable previously included in income. *475 The taxpayer did not maintain a reserve for bad debts but instead used the specific charge off method of reporting bad debts for Federal tax purposes. See 50 T.C. at 529. After adoption of a plan of complete liquidation the taxpayer sold the accounts receivable for an amount less than their face value and sought to recognize the loss. Relying on the pertinent legislative history and our opinion in Family Record Plan, Inc., we allowed recognition of the loss. In analyzing whether the term "installment obligations" encompassed such accounts receivable we stated, 50 T.C. at 533-34: We believe the intent of section 337(b)(1)(A) and (B) is much broader than the ground covered by section 453 with reference to the obligations there involved and is designed to embrace accounts receivable arising from the sale of stock in trade by an accrual basis corporation as well. Here the taxpayer, on the accrual method of accounting, reported and paid income taxes on its sales as the accounts accrued. Later when it sold those accounts during liquidation it was certainly selling property excluded by section 337(b)(1) from the nonrecognization provisions of section *476 337(a)(1) and (2).Respondent's position is contrary here not only to his former views but also to the congressional intent. The taxpayer in Family Record Plan, Inc.,supra, reported income for Federal tax purposes on the cash method. Petitioner herein used the accrual method of accounting. The rationale we used in Family Record Plan, Inc., was not dependent upon any accounting method. Rather, we reached a conclusion we deemed to be harmonious with that intended by the Congress.Any sale in the ordinary course of business within the specified period following adoption of a liquidation plan should result in gain or loss to the corporation as if it were not in the process of liquidating. The accounts receivable with which we are concerned here represent consideration for sales of stock in trade in the ordinary course of petitioner's business. Thus, the accounts are a mere extension of ordinary business transactions. Had the accounts been sold under ordinary circumstances and not during the year following adoption of the plan of liquidation an ordinary loss rather than a capital loss would have been recognized. Coast Coil Co. was affirmed per *477 curiam by the Ninth Circuit. Respondent contends here, however, that, as argued by the dissent in the Ninth Circuit, the result in Coast Coil Co. is contrary to the legislative intent as evinced by Congressional action in rejecting a House bill containing allegedly broader language -- "rights to income". According to the dissent this would have included accounts receivable but instead the "narrower language, 'installment obligations,' was chosen". 422 F.2d at 403. We find this argument unpersuasive.
The difficulty with the argument is twofold. First, it is based strictly on an inference, an inference which is only one of several possible inferences and one which is not supported by any explanatory language in the legislative history. Second, it is premised on the very assumption it attempts to prove -- that as used in section 337(b)(1)(B) the term installment obligations is narrower than the term accounts receivable. [4] As fully explained in Family Record Plan, Inc. and Coast Coil Co., however, the intent of Congress was to require recognition of gain or loss realized with respect to sales arising in the ordinary course of business.The accounts receivable *478 here arose from sales in the ordinary course of business and under our holding in Coast Coil Co. are considered a "mere extension of ordinary business transactions". 50 T.C. at 534. Consequently, the Accounts do qualify as installment obligations for purposes of section 337(b)(1)(B). Accordingly, we hold that Oharco is entitled to recognize the $50,000 loss which it realized on the sale of its Accounts to B H & L. *479 The next issue for our decision is whether Oharco is entitled to a deduction of $428,500 as a result of the settlement regarding certain of the Accounts which had been sold to B H & L. After the initial sale to B H & L on March 9, 1973, B H & L became concerned that the Accounts were uncollectible in amounts in excess of the aggregate of the $50,000 purchase discount and the $220,000 Escrow Agreement (Accounts). In the latter part of 1973 it retained independent accountants to prepare a special report with respect to the Accounts. Representatives of B H & L and Oharco met to discuss the difficulty. Preliminary negotiations were unsuccessful, and in early 1974 Oharco filed a declaratory judgment to resolve the conflict. B H & L formally notified Oharco of a claim for damages in excess of $1,200,000. In settlement of this claim Oharco paid B H & L $528,500 and B H & L transferred to Oharco a corresponding amount of the Accounts which Oharco believed were collectible to the extent of approximately $100,000. Oharco deducted the difference ($428,500) on its 1974 return as compensatory damages paid. Respondent contends that the $428,500 is not deductible as compensatory damages, *480 but instead is Oharco's cost basis in the Accounts received for which no bad debt deduction is allowable under section 166 since the Accounts were worthless at the time they were purchased. Alternatively, respondent contends that, if the uncollectible Accounts are deductible as bad debts, the deduction is not Oharco's but rather belongs to petitioner which, respondent argues, was the purchaser of the Accounts. Petitioner, on the other hand, does not rely on deduction under section 166 as a bad debt. Instead, petitioner contends that under the holding in Arrowsmith v. Commissioner, 344 U.S. 6 (1952), the settlement should be viewed as part of the original transaction and should be afforded the same recognition as the $50,000 loss initially realized on the sale of the Accounts. After careful consideration of the arguments of the parties, we conclude that Oharco is entitled to a bad debt deduction for the Accounts pursuant to section 166. Section 166 allows a deduction for debts which become worthless within the taxable year to the extent of the taxpayer's basis therein. [5] If a debt is worthless at the time of acquisition, however, it is not regarded for tax purposes *481 as a valid debt in the hands of the taxpayer who acquires it. See Putnam v. Commissioner, 352 U.S. 82, 88 (1956); Reading Co. v. Commissioner, 132 F.2d 306, 310 (3rd Cir. 1942), cert. denied 318 U.S. 778 (1943); W. F. Young, Inc. v. Commissioner, 120 F.2d 159, 165 (1st Cir. 1941); Markle v. Commissioner, 17 T.C. 1593, 1598-99 (1952), appeal dismissed (3rd Cir., April 7, 1953). Advances under such circumstances are viewed as a gift or contribution to capital. *482 The circumstances here, however, do not fit neatly within such a principle. The settlement by Oharco can not be characterized as either a gift or a contribution to capital. Nor do we find controlling certain factually distinguishable cases relied upon by respondent for the proposition that no deduction is allowable since Oharco's motivation in acquiring the Accounts was to permit winding up liquidation rather than reasons related to business or profit motives. See Bessenyey v. Commissioner, 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967); Dresser v. United States, 74 Ct. Cl. 55, 55 F.2d 499 (1932), cert. denied 287 U.S. 635 (1932); Stephenson v. Commissioner, 43 F.2d 348 (8th Cir. 1930). The difficulty with respondent's approach is that he focuses on the repurchase of the Accounts as an isolated transaction distinct from the original sale of the Accounts to Oharco. We think that the substance of the transactions can be evaluated only in light of the entire sequence of events. Petitioner has attempted this by arguing that under the holding of Arrowsmith v. Commissioner, supra, *483 the settlement payments must be characterized by reference to the original transaction out of which the payment arose. Since the payment of $428,500 to B H & L was based solely upon the value of the Accounts at the date of the original sale, petitioner argues, such payment constituted a discount on the original sale of the Accounts which is recognizable under section 337(b)(1)(B). Respondent properly points out, however, that the facts here are inconsistent with characterizing the $428,500 as an original purchase discount. If the payment was a discount on the original sale, B H & L would not have transferred the Accounts of questionable collectibility back to Oharco. Consequently, it would be improper to allow recognition of a loss on these Accounts on the same ground on which the $50,000 loss actually realized on the sale of Accounts originally is recognizable. Failure to allow recognition of the loss as an original purchase discount does not require, however, characterization of the subsequent retransfer of the doubtful Accounts as an independent purchase of worthless debts. In our view the substance of the transaction with B H & L was a partial rescission of the original *484 sale. B H & L returned certain of the Accounts to Oharco and received in return the original consideration allocable thereto. As a consequence, Oharco held the Accounts the same in substance as if they had never been transferred to B H & L. Consequently, Oharco's basis in the Accounts is attributable to the original accrual of those Accounts as they arose in the operation of its business and a bad debt deduction for the Accounts under section 166 is allowable. A bad debt is deductible only in the year it becomes worthless. Denver & Rio Grande Western Railroad Co. v. Commissioner, 32 T.C. 43, 56 (1959), affd. 279 F.2d 368 (10th Cir. 1960); Perry v. Commissioner, 22 T.C. 968, 973 (1954). Here both parties concede that the Accounts were worthless to the extent of $428,500 in 1974 and we conclude on this record that 1974 is the proper year for deduction. The Accounts were the object of a good faith arm's length sale on March 1973 and it was only subsequently the parties concluded that the Accounts were largely uncollectible. The independent accountant's report in late 1973 indicated questionable collectibility, but the parties continued *485 to ddbate the issue until final settlement in 1974. Although the settlement was based on the parties view of the value of the Accounts at the date of their original sale to B H & L, this was with the benefit of hindsight and is not conclusive as to the year the Accounts actually became worthless. Moreover, it appears to be of no great significance whether the Accounts became worthless in 1973 instead of 1974 since the primary tax benefit from the deduction arises from a carryback from 1974 to earlier years, which benefit would be available to Oharco in either event. Finally, we note that respondent has made no contention that 1974 is an improper year for the bad debt deduction. We find no merit in respondent's alternative contention that, if the uncollectible Accounts are deductible as bad debts, then the deduction belongs to petitioner. Respondent's argument is based on the faulty premise that petitioner purchased the Accounts. Under our view the transfer of the Accounts was a consequence of a rescission rather than an independent purchase. In either event, however, we think the deduction belongs to Oharco. The Accounts arose in the operation of Oharco's business. The Purchase *486 Agreement and escrow accounts thereunder were negotiated by Oharco. The subsequent rescission was similarly negotiated and executed by Oharco, not by petitioner. The consideration returned to B H & L came from the escrow accounts and a cashier's check delivered by Oharco. Although the Accounts were assigned by B H & L to petitioner, this was done at the direction of Oharco and the Accounts in question were worthless at the time of the assignment. We find that the deduction belongs to Oharco rather than to petitioner. Accordingly, we hold that Oharco is entitled to recognize both a $50,000 loss under section 337(b)(1)(B) on the initial sale of the Accounts to B H & L in 1973 and a $428,500 bad debt deduction under section 166 in 1974 for those uncollectible Accounts which B H & L returned to Oharco. [6] To reflect concessions by the parties and our conclusions on the disputed issues. Decision will be entered *487 under Rule 155.
Footnotes
1. Unless specified otherwise, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS. (a) GENERAL RULE.--If-- (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period. (b) PROPERTY DEFINED.-- (1) IN GENERAL.--For purposes of subsection (a), the term "property" does not include-- (A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business, (B) installment obligations acquired in respect of the sale or exchange (without regard to whether such sale or exchange occurred before, on, or after the date of the adoption of the plan referred to in subsection (a)) of stock in trade or other property described in subparagraph (A) of this paragraph, * * *↩
3. Respondent focuses on the last sentence of the foregoing quote and, applying it literally, argues that, if installment obligations arising out of sales in the ordinary course of business are to be treated as inventory, the sale of the Accounts here amounts to a bulk sale for which nonrecognition is provided in section 337(b)(2). Such an approach ignores the clear import of the sentence. In the context of the entire report, the sentence means that installment obligations arising out of the sales in the ordinary course of business are to be characterized in the same manner in which the individual sales which gave rise to them would be characterized.↩
4. As additional support for this proposition respondent points to sections 279(c)(5) and 542(d)(1)(A)(ii), enacted after section 337, which define a lending or finance business as "a business of making loans or purchasing or discounting accounts receivable, notes or installment obligations". If accounts receivable are included within the term installment obligation, respondent argues, Congress would not have used both terms in the same phrase in these sections. We do not attach much significance to this argument. First, substantial overlap exists between accounts receivable, notes and installment obligations; the categories are not for all purposes mutually exclusive.In addition, the sections cited are unrelated to section 337 and in no way negate the congressional intent for including the exception for installment obligations in section 337(b)(1)(B). Moreover, the use of the term installment obligations without reference to section 453 indicated that the term was meant to be much broader than those for which section 453 was elected. As we noted in Family Record Plan, Inc. v. Commissioner, 36 T.C. 305, 311↩ (1961), "If the term 'installment obligations' was a phrase of art, no reference to section 453 would be necessary when it was used. It is significant that each time the phrase is used in section 336, 381, and 691, there is a specific reference to section 453. However, when 'installment obligations' was used in section 337(b) there was no reference to section 453. In view of the congressional intent expressed in the committee report set out above, we believe it clear that the term is not limited to situations where the taxpayer has elected to use the installment method."
5. SEC. 166. BAD DEBTS. (a) GENERAL RULE.-- (1) WHOLLY WORTHLESS DEBTS.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) PARTIALLY WORTHLESS DEBTS.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) AMOUNT OF DEDUCTION.--For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.↩
6. Our holding on these issues makes it unnecessary to resolve whether petitioner would be liable as transferee for the deficiencies determined with respect to the Accounts, and apparently petitioner acknowledges transferee liability for those issues it has conceded.↩